**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| SPEECH FIRST, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> BRIAN MCCALL, in his official capacity as Chancellor of the Texas State University System; KELLY DAMPHOUSSE, in his official capacity as President of Texas State University; ALEXANDRIA HATCHER, in her official capacity as Director of the Office of Equal Opportunity and Title IX for Texas State University; KEN PIERCE, in his official capacity as Vice President for Information Technology for Texas State University; DANIEL OWEN, in his official capacity as Chief Information Security Officer for Texas State University; EARL C. AUSTIN, GARRY D. CRAIN, ALAN TINSLEY, CHARLIE AMATO, SHEILA FASKE, DIONICIO FLORES, VERONICA HARLE, STEPHEN LEE, and WILLIAM F. SCOTT, in their official capacities as members of the Texas State University System Board of Regents, <br><br> *Defendants.* | Case No. 1:23-cv-00411 <br><br> **VERIFIED COMPLAINT** |

Plaintiff, Speech First, Inc., brings this action under the First and Fourteenth Amendments to the U.S. Constitution, *see* 42 U.S.C. §1983, against Defendants and alleges as follows:

**INTRODUCTION**

1.      "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American [universities]." *Healy v. James*, 408 U.S. 169, 180 (1972). "Colleges and universities serve as the founts of—and the testing grounds for—new ideas. Their

chief mission is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022).

2.      Yet the Texas State University and System, along with their officials, have a speech code that punishes students for engaging in protected speech. This code deters students from expressing views that are outside the mainstream about the political and social issues of the day. It disregards decades of precedent.

3.      Specifically, the University's policy on discriminatory "harassment" disciplines students for "unwelcome verbal, written, graphic, or physical conduct" that:

> a. "is directed at an individual or group of individuals because of their race, color, national origin, age, sex, religion, disability, veterans' status, sexual orientation, gender identity, or gender expression"; and
>
> b. "is sufficiently severe or pervasive so as to interfere with an individual's employment, education, academic environment, or participation in institution programs or activities; and creates a working, learning, program, or activity environment that a reasonable person would find intimidating, offensive, or hostile."

4.      By design, this policy extends well beyond the Supreme Court's definition of harassment in *Davis Next Friend LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999)—a constitutional no-no, since the Supreme Court adopted that narrow definition precisely to avoid clashing with the First Amendment.

5.      Speech First has members who attend Texas State University and whose protected speech is chilled by the discriminatory-harassment policy. This policy, and any policy like it, should be declared unconstitutional and enjoined.

6.      So, too, for the University's computer policy. That policy prohibits using the University's "information resources to affect the result of a local, state, or national election or

to achieve any other political purpose (consistent with Texas Government Code §556.004)" or a "similar activit[y]." The policy thus sweepingly bars students from using their university email addresses to send messages with a "political purpose" and other "similar activities." This vague, content-based, and overbroad restriction of protected speech violates the First and Fourteenth Amendments. This policy, and any policy like it, should be declared unconstitutional and enjoined.

## JURISDICTION AND VENUE

7.    This action arises under the First and Fourteenth Amendments to the U.S. Constitution and is brought via 42 U.S.C. §1983 and §1988.

8.    This Court has subject-matter jurisdiction under 28 U.S.C. §1331 and §1343.

9.    Venue is proper under 28 U.S.C. §1391 because all Defendants reside here and because a substantial part of the events or omissions giving rise to the claims occurred here.

## PARTIES

10.    Plaintiff, Speech First, Inc., is a nationwide membership organization of students, alumni, and other concerned citizens. Speech First is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment. Speech First seeks to protect the rights of college students through litigation and other lawful means. *E.g.*, *Speech First, Inc. v. Khator*, 603 F. Supp. 3d 480 (S.D. Tex. 2022); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022); *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019); *Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020).

11.    Speech First has members who attend the University, including Students A, B, and C.

12.     The Texas State University System is a public institution that oversees Lamar University, Sam Houston State University, Sul Ross State University, Texas State University, Lamar Institute of Technology, Lamar State College Orange, and Lamar State College Port Arthur.

13.     Texas State University is a public university organized and existing under the laws of Texas.

14.     Defendant Brian McCall is Chancellor of the Texas State University System. McCall is responsible for the enactment and enforcement of System policies, including the System policies challenged here. McCall is sued in his official capacity.

15.     Defendant Kelly Damphousse is President of the University. Damphousse is responsible for the enactment and enforcement of University policies, including the University policies challenged here. Damphousse is sued in his official capacity.

16.     Defendant Alexandria Hatcher is Director of the Office of Equal Opportunity and Title IX for Texas State University. Hatcher is responsible for the enactment and enforcement of University policies, including the University policies challenged here. Hatcher is sued in her official capacity.

17.     Defendant Ken Pierce is Vice President for Information Technology for Texas State University. Pierce is responsible for the enactment and enforcement of University policies, including the computer policy challenged here. Pierce is sued in his official capacity.

18.     Defendant Daniel Owen is Chief Information Security Officer for Texas State University. Owen is responsible for the enactment and enforcement of University policies, including the computer policy challenged here. Owen is sued in his official capacity.

19.     Defendants Earl C. Austin, Garry Crain, Alan L. Tinsley, Charlie Amato, Shelia Faske, Dionicio Flores, Stephen Lee, William F. Scott, and Gabriel Webb are members of the University Board of Regents. The Board of Regents serves as the final authority responsible for University policies, including the University policies challenged here. The Board Defendants are all sued in their official capacities.

## BACKGROUND

### I.    College Students and Their First Amendment Rights

20.     "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

21.     The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]. The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180. The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)); *see also Cartwright*, 32 F.4th at 1128 ("Nowhere is free speech more important than in our leading institutions of higher learning."). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain

new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957).

22.     The First Amendment's protections are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

23.     "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). Indeed, "the point of all speech protection is … to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995). These principles apply with more force "[i]n our current national condition," not less. *Fenves*, 979 F.3d at 339. "Accordingly, it is imperative that colleges and universities toe the constitutional line when monitoring, supervising, and regulating student expression." *Cartwright*, 32 F.4th at 1129.

## II.    Universities' Unconstitutional Harassment Policies Chill Speech

24.     Instead of promoting the "robust exchange of ideas," *Keyishian*, 385 U.S. at 603, universities today are often more interested in protecting students from ideas that make them uncomfortable. Universities do this by adopting policies and procedures that discourage speech by students who dare to disagree with the prevailing campus orthodoxy.

25.     One tried-and-true method of accomplishing this feat is the campus speech code. Speech codes, according to the Foundation for Individual Rights and Expression

(FIRE), are "university regulations prohibiting expression that would be constitutionally pro-
tected in society at large." *Spotlight on Speech Codes 2022* at 9, FIRE, perma.cc/WP4U-Z98Z.
Under the guise of "prohibit[ing] discriminatory harassment, unconstitutionally overbroad
harassment policies" have "proliferated" at universities across the country. *Spotlight on Speech
Codes 2021* at 13, FIRE, perma.cc/S22E-76Q3 (*2021 Spotlight*). All too often, "harassment"
bans "fail to limit themselves to the narrow definition of harassment that is outside the realm
of constitutional protection. Instead, they expand the term to prohibit broad categories of
speech that do not even approach actionable harassment, despite similar policies having been
struck down by federal courts years earlier." *Id.* at 16 & n.50 (collecting cases); *see also Fenves*,
979 F.3d at 338-39 & n.17 (collecting a "consistent line of cases that have uniformly found
campus speech codes unconstitutionally overbroad or vague").

26.     Contrary to popular belief, "'there is no harassment exception to the First
Amendment's Free Speech Clause.'" *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008)
(quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204, 210 (3d Cir. 2001)). When bans
on "'harassment'" cover speech, they impose "'content-based'" and often "'viewpoint-dis-
criminatory'" restrictions on that speech. *Saxe*, 240 F.3d at 206 (quoting *DeAngelis v. El Paso
Mun. Police Officers Ass'n*, 51 F.3d 591, 596-97 (5th Cir. 1995)).

27.     Universities with overbroad harassment policies often point to Title IX as a
defense. *See 2021 Spotlight* at 25. It's true that in *Davis*, the Supreme Court held that schools
can violate Title IX's ban on sex-based discrimination if they are deliberately indifferent to
sexual harassment by students. 526 U.S. at 633. But *Davis* recognized that public schools are
constrained by the First Amendment and thus adopted a narrow, speech-protective definition

of sexual harassment: Actionable harassment under Title IX must be "behavior [that] is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education." *Id.* at 652.

28.     Despite this clear guidance from the Supreme Court, many universities define "harassment" more broadly than *Davis. See 2021 Spotlight* at 25.

29.     The Department of Education formally addressed this issue in 2020. Instead of following prior administrations' tendency to use guidance, the Department issued a regulation via notice-and-comment rulemaking. That 2020 rule "adopts" the Supreme Court's definition of sexual harassment from *Davis* "verbatim." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,036 (May 19, 2020). The *Davis* standard, the rule explains, "ensures that speech … is not peremptorily chilled or restricted" because it applies only when harassment rises to the level of "serious *conduct* unprotected by the First Amendment." *Id.* at 30,151-52 (emphasis added); *see also id.* at 30,162-63. The 2020 rule thus defines "[s]exual harassment" to mean, in relevant part, "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 34 C.F.R. §106.30(a).

30.     Unfortunately, the Department's 2020 rule did not settle things. Most universities responded to it by imposing two separate harassment policies: one "Title IX harassment policy" that adopts the *Davis* standard, and another "non-Title IX harassment policy" that is much broader. *See 2021 Spotlight* at 26. And the Department is expected to repeal the 2020 rule in May 2023 and replace it with a rule that abandons the *Davis* standard.

31.     The consequences are unsurprising. The rise of overbroad "harassment" poli-cies at universities has contributed to a parallel rise in the percentage of college students who believe they are not free to express controversial opinions on campus. *See 2022 College Free Speech Rankings* at 62, FIRE (2022), perma.cc/B7PP-PDAJ. According to a September 2020 survey of more than 20,000 American college students, 42 percent believe their university would punish them for making an offensive or controversial statement. *2020 College Free Speech Rankings*, at 19, FIRE (Sept. 2020), perma.cc/WQ6W-JFZ2. And in a 2022 survey, 83 percent of students stated that they sometimes "could not express [their] opinion on a subject because of how students, a professor, or the administration would respond." *2022 College Free Speech Rankings* at 62; *see also id.* at 2 (explaining that nearly half of students said it was difficult to openly and honestly discuss on campus abortion (49%), racial inequality (48%), COVID-19 vaccine mandates (45%), transgender issues (44%), gun control (43%), mask mandates (43%), and police misconduct (43%)). That same survey reported that 52 percent of students believe that campuses should ban any speaker who promotes the idea that "[t]ransgender people have a mental disorder," and that 48 percent believe campuses should ban any speaker who pro-motes the idea that "Black Lives Matter is a hate group." *Id.* at 24; *see also id.* at 2 ("Opposition to allowing controversial conservative speakers on campus ranged from 59% to 73%"). A separate survey found that, among non-freshman college students, nearly half reported that "sharing ideas and asking questions without fear of retaliation, even when those ideas are of-fensive to some people," had become "more difficult" in Fall 2020 than previously. *Campus Expression Survey Report 2020*, at 3, Heterodox Academy (Mar. 2021), perma.cc/49LS-DBF6.

32.     The University is no stranger to First Amendment incidents. At the end of 2017, an "independent student newspaper" published a controversial "editorial by [an] opinion columnist." *Texas State University: Independent Student Newspaper Under Fire for Controversial Opinion Column*, FIRE (2017), perma.cc/R2SE-YUSV. Numerous university officials, including "the university president, the assistant vice president of communications, … and the student government president," denounced the editorial. *Id.* The University's "Student Government president threatened to attack the paper's funding unless its editor-in-chief, the opinions editor, and [the columnist] all resigned"; "[o]ther students began a petition to strip [the newspaper] of its funding"; and the Director of the University's journalism school "announced that she was forming a committee to review the newspaper's editorial process." *The 10 Worst Colleges for Free Speech: 2018*, FIRE (Feb. 12, 2018), perma.cc/EN8L-BTPP. FIRE intervened, but the University never responded with "any concrete commitment to safeguarding students' First Amendment rights." *Id.* As a result, the University made FIRE's annual list of "[t]he 10 worst colleges for free speech." *Id.*

33.     Recently, the University ran headlong into the First Amendment again. The University had a policy barring resident assistants and other university "employees from speaking to the media without administrative approval, even in their personal capacity on issues of public concern." *Texas State University: RAs Punished for Speaking to The University Star Student Newspaper*, FIRE (2023), perma.cc/W7Y3-L357. In late 2022, the University proceeded to enforce the policy: The University "issued written warnings to three of its student-employees because they spoke with … the campus newspaper." *Id.* Soon after, "FIRE wrote Texas State urging it to revise this policy to comply with its First Amendment obligations to respect the

expressive rights of student-employees." *Id.* Only after that threat did Texas State "remov[e] the written warnings from the RAs' personnel files." *Id.*

### III.   The University's Discriminatory-Harassment Policy

34.    On September 2, 2020, the University revised UPPS 04.04.46, titled "Prohibition of Discrimination." This policy covers "prohibited harassment" because it claims that such harassment amounts to "discrimination."

35.    The discriminatory-harassment policy applies to "any university activity or program." It covers "[f]aculty members, staff employees, and students."

36.    The policy defines "[h]arassment" as "unwelcome verbal, written, graphic, or physical conduct that":

> a. "is directed at an individual or group of individuals because of their race, color, national origin, age, sex, religion, disability, veterans' status, sexual orientation, gender identity, or gender expression"; and
>
> b. "is sufficiently severe or pervasive so as to interfere with an individual's employment, education, academic environment, or participation in institution programs or activities; and creates a working, learning, program, or activity environment that a reasonable person would find intimidating, offensive, or hostile."

37.    The University specifies that prohibited harassment need not "be targeted at a particular individual in order to create a harassing environment, nor must the conduct result in a tangible injury."

38.    "Whether the alleged conduct constitutes prohibited harassment depends on the totality of the particular circumstances, including the nature, frequency, and duration of the conduct in question, the location and context in which it occurs, and the status of the individuals involved."

39.    The University requires numerous school officials to discuss the policy and "issues of discrimination" with "faculty, staff, graduate student employees, and teaching assistants," among others.

40.    University employees "in a supervisory position (i.e., vice presidents, deans, directors, chairs, department heads, and supervisors)" who "learn of a possible instance or allegation of discrimination" are "required to notify the director for the Office of Equal Opportunity and Title IX." Others not in a supervisory position are "encouraged to notify the director when they learn of a possible instance of discrimination."

41.    Students can allege harassment "through university supported informal … and formal … procedures."

42.    A formal complaint includes (1) the complainant's contact information, (2) the contact information of the accused, and (3) "a description of the alleged discriminatory act or acts in sufficient detail to enable the director to understand what occurred, when it occurred, and the basis for the alleged discrimination (race, color, national origin, age, sex, religion, disability, veterans' status, sexual orientation, gender identity, or gender expression)."

43.    The "vice president" or "other designated sanctioning authority" determines whether the discriminatory-harassment policy is violated and, if so, the appropriate "sanctions." The relevant official can impose "sanctions," which for students include "disciplinary action up to and including dismissal from the university."

44.    "The sanction will be imposed immediately." The relevant "administrative authority … will continually monitor the circumstances to ensure a remedied situation."

45.     "The decision of the vice president or other designated sanctioning authority is final." That is, the accused cannot challenge the official's determination that he violated the discriminatory-harassment policy. The accused "may appeal only the action's severity through the regular grievance process."

46.     To the extent that the policy "conflicts with any policy, rule, or regulation at the university," the discrimination policy "shall take precedence."

47.     The System and the University have other policies regarding harassment. The System has policies on "racial harassment" and "sexual harassment." But it is not clear how these policies interact with the University's discriminatory-harassment policy.

48.     For example, the System's racial-harassment policy prohibits "racial harassment" and defines it as "extreme or outrageous acts or communications that are intended to harass, intimidate, or humiliate students, faculty, staff or visitors on account of race, color, or national origin and that reasonably cause them to suffer severe emotional distress." And under the header "Invalidity of Conflicting Rules and Procedures," the System's Rules and Regulations state: "All rules and procedures contained in handbooks and other policy statements at the System's [universities] are invalid insofar as they conflict with these Rules and Regulations. Whenever the policies differ from the policies or procedures set forth in these Rules and Regulations, these Rules and Regulations will control, and the differing policies or procedures at the [University] will be disregarded."

49.     The System's sexual-harassment policy states that sexual harassment includes "unwelcome sex-based verbal or physical conduct that … in the education context, is sufficiently severe, persistent, or pervasive that the conduct interferes with the student's ability to

participate in or benefit from Education Programs or Activities at a post-secondary educational institution." This System policy also provides: "In the case of allegations of Sexual Misconduct, this Policy supersedes any conflicting Sexual Misconduct procedures and policies set forth in other [University] policies."

50.     On the other hand, the System's Rules and Regulations define "sexual harassment" to include "other verbal or physical conduct of a sexual nature when … such conduct has the purpose or effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile, or offensive employment or academic environment."

51.     To the extent that these System policies have force independent from the University's discriminatory-harassment policy and depart from the *Davis* standard, Speech First challenges them too. These System policies are likewise unconstitutional to the extent they depart from *Davis*.

## IV.     The University's Computer Policy

52.     In July 2022, the University issued the current version of UPPS No. 04.01.07, titled "Appropriate Use of Information Resources." This computer policy "applies to all individuals whose affiliation with Texas State requires or permits their access to university email resources without regard to the manner, form, or location of access." The University's email system, known as BobcatMail, is made available to each student.

53.     Students violate the computer policy if they use the University's "information resources to affect the result of a local, state, or national election or to achieve any other political purpose (consistent with Texas Government Code §556.004)" or a "similar activit[y]."

54.     The word "political" in the computer policy is undefined.

55.     The policy informs students that they "must report any abuse or misuse of information resources or violations of this policy to the Information Security Office or to the Information Technology Assistance Center."

56.     Violating the computer policy "may lead to the revocation of a user's Texas State NetID, suspension of elevated access privileges, suspension, dismissal, or other disciplinary action by the university, as well as referral to legal and law enforcement agencies."

## V.     The Effect of the University's Policy on Speech First's Members

57.     Speech First's members who attend the University are suffering concrete injuries as a direct result of the University's unconstitutional harassment policy. These students want to engage in speech that is arguably covered by the University's policies, but they credibly fear that the expression of their deeply held views is prohibited. Rather than risk being reported, investigated, or sanctioned, Speech First's members—including Students A, B, and C—do not speak as freely as they otherwise would.

58.     One Speech First member, Student A, is a sophomore at Texas State University. Student A is proceeding under a pseudonym because she is a current student at the University and, if her participation in this litigation becomes public, she fears reprisal from the University, her professors, her fellow students, and others.

59.     Student A is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

60.     Student A is staunchly opposed to affirmative action in college admissions and believes it is just old-fashioned racism by another name. Student A believes that giving

preferences to college or job applicants based solely on the color of their skin is immoral and unconstitutional.

61.     Student A also believes that abortion is wrong and that women should not be allowed to kill innocent babies. She believes that the idea that a mother and a father can decide that a baby should die if its existence is inconvenient has no place in a civilized society.

62.     Student A believes that illegal immigration is wrong and that the government should enforce the immigration laws. She also believes that the government should not use taxpayer dollars paid by hard-working Americans to subsidize in-state tuition benefits for illegal aliens.

63.     Student A believes that sex is inherent and immutable and that there is no such thing as a "gender spectrum." She believes that the exponential growth in adolescents and young adults who identify as transgender or "non-binary" is evidence that many people now claim a certain "gender identity" because they want attention. Student A also believes that minors are too young to make decisions about their gender identity and their sexual orientation.

64.     Student A enrolled at the University because she wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

65.     Student A wants to engage in open and robust intellectual debate with her fellow students about these topics in the classroom, in other areas of campus, online, and in the City of San Marcos.

66.     When a classmate or another member of the University community voices con-trary views about these and other controversial topics, including affirmative action, abortion, gender identity, the nuclear family, or immigration, Student A wants to point out the flaws in their arguments and convince them to change their minds. Student A wants to speak directly to her classmates about these topics, including by using specific personal examples that may feel targeted, and she wants to talk frequently and repeatedly on these issues. Given her views, Student A knows that many of these conversations will be heated, passionate, and targeted. But she wants to have these conversations because she feels strongly about these issues.

67.     But the University's harassment policy deters Student A from openly expressing her opinions or having these conversations.

68.     Student A does not fully express herself or talk about certain issues because she fears that sharing her beliefs will be considered "harassment." For example, she fears that others on campus will find her views "unwelcome," "hostile," and "intimidating" and claim that her views "interfer[e] with" their education or academic environment, especially when she shares those views passionately and repeatedly. Many of the topics that Student A wants to address could easily be considered "harassment" under the University's policy (or any materi-ally similar policy that applies on campus).

69.     Finally, Student A wants to send politically oriented emails—including emails regarding controversial political issues—to her fellow students from her university email address. But Student A refrains from doing so because she is afraid that she will be punished under the computer policy if she does.

70.     Another Speech First member, Student B, is a junior at the University. Student B is proceeding under a pseudonym because she is a current student at the University and, if her participation in this litigation becomes public, she fears reprisal from the University, her professors, her fellow students, and others.

71.     Student B is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

72.     Student B believes that life begins at conception and that abortion is a grave evil. She further believes that no one has the right to end an innocent life just because a pregnancy is "unplanned" or "unwanted."

73.     Student B also believes that marriage is only between a man and a woman and that children are healthiest when they are raised as part of a nuclear family. Student B is a Christian, and her views on this issue stem partly from her religious beliefs. For the same reasons, Student B believes it is wrong for two men to use a "surrogate" to carry a baby. In Student B's view, the gay couple is simply "renting" the wombs of women, many of whom are in difficult financial circumstances.

74.     Student B believes that gender dysphoria is a real condition that can occur in rare cases but that biological sex is immutable and cannot change based on someone's internal feelings or how they "identify." Student B does not want to be forced to affirm that a biological male is actually a female, or vice versa, simply because someone will be offended by her beliefs.

75.     Student B enrolled at the University because she wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

76.     Student B wants to engage in open and robust intellectual debate with her fellow students about these topics in the classroom, in other areas of campus, online, and in the City of San Marcos.

77.     When a classmate or another member of the university community voices contrary views about these and other controversial topics, including affirmative action, abortion, gender identity, the nuclear family, or immigration, Student B wants to point out the flaws in their arguments and convince them to change their minds. She wants to speak directly to her classmates about these topics, including by using specific personal examples that may feel targeted, and she wants to talk frequently and repeatedly on these issues. She knows that, given her views, many of these conversations will be heated, passionate, and targeted. But she still wants to have them because she feels strongly about these issues.

78.     But the University's harassment policy deters Student B from openly expressing her opinions or having these conversations.

79.     Student B does not fully express herself or talk about certain issues because she fears that sharing her beliefs will be considered "harassment." For example, she fears that others on campus will find her views "unwelcome," "hostile," and "intimidating" and claim that her views "interfer[e] with" their education or academic environment, especially if she shares those views passionately and repeatedly. Many of the topics that she wants to address could easily be considered "harassment" under the University's policy (or any materially similar policy that applies on campus).

80.     Finally, Student B wants to send politically oriented emails—including emails regarding local, state, or national elections and particular candidates in those elections—to her

fellow students from her university email address. Student B refrains from doing so, however, because she is afraid that she will be punished under the computer policy if she does.

81.     Another Speech First member, Student C, is a freshman at the University. Student C is proceeding under a pseudonym because he is a current student at the University and, if his participation in this litigation becomes public, he fears reprisal from the University, his professors, his fellow students, and others.

82.     Student C is politically conservative and holds political beliefs that are unpopular, controversial, and in the minority on campus.

83.     Student C believes that human beings are created male or female and that a person cannot "transition" from one to the other. Student C has no ill-will towards members of the LGBT community, but he cannot in good conscience pretend that a biological male is actually a woman simply because he believes that to be "his truth."

84.     Student C is also firmly pro-life. He believes that abortion kills a defenseless baby and that elective abortions should be illegal in all circumstances. He believes that many men who claim to be "pro-choice" are really just interested in avoiding the responsibility of fatherhood and living with the consequences of their decisions.

85.     Student C opposes illegal immigration and believes that "open border" policies are destructive and dangerous. In Student C's view, the government should focus on providing services to men and women who live in this country legally rather than extending already-strained support systems to those who have no right to be here.

86. Student C enrolled in the University because he wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

87. Student C wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the City of San Marcos.

88. When a classmate or another member of the university community voices contrary views about these and other controversial topics, including affirmative action, abortion, gender identity, the nuclear family, or immigration, Student C wants to point out the flaws in their arguments and convince them to change their minds. Student C wants to speak directly to his classmates about these topics, including by using specific personal examples that may feel targeted, and he wants to do so frequently and repeatedly. Given his views, Student C knows that many of these conversations will be heated, passionate, and targeted. But he wants to have these conversations because he feels strongly about these issues.

89. The University's harassment policy, however, deters Student C from openly expressing his opinions or having these conversations.

90. Student C does not fully express himself or talk about certain issues because he fears that sharing his beliefs will be considered "harassment." For example, he fears that others on campus will find his views "unwelcome," "hostile," and "intimidating" and claim that his views "interfer[e] with" their education or academic environment, especially if he shares those views passionately and repeatedly. Many of the topics that he wants to address could easily be

considered "harassment" under the University's policy (or any materially similar policy that applies on campus).

91.     The chilling effect of the University's policy is exacerbated by the fact that the University makes all freshmen live on campus. The University requires "[a]ll students who graduated from high school within the preceding 12 months of the semester of their admission" and "[n]ew freshmen under the age of 20 … to live in on-campus university housing." In other words, the policy chills students' speech even when they are "at home."

92.     Finally, Student C wants to send politically oriented emails—including emails regarding local, state, or national elections and particular candidates in those elections—to his fellow students from his university email address. Student C refrains from doing so, however, because he is afraid that he will be punished under the computer policy if he does.

93.     Similarly worded harassment policies have been applied to protected speech, or have been found to arguably ban protected speech, before.

94.     In *Fenves*, Speech First challenged the University of Texas's harassment policy. That policy prohibited "hostile or offensive speech" that is "sufficiently severe, pervasive, or persistent to create an objectively hostile environment"; that "interferes with or diminishes the victim's ability to participate in or benefit from" the University's activities; and that "personally describes or is personally directed to one or more specific individuals." 979 F.3d at 334 n.12. The Fifth Circuit held that this policy arguably covered Speech First's members, who "wish[ed] to engage in robust debate on timely and controversial political topics from a contrarian point of view." *Id.* at 330.

95.     In *Cartwright*, Speech First challenged the University of Central Florida's discriminatory-harassment policy. That policy prohibited "verbal, physical, electronic, or other conduct" based on a long list of characteristics including "religion [or] non-religion," "genetic information," "veteran's status," and "political affiliatio[n]." 32 F.4th at 1114-15. The Eleventh Circuit held that this policy likely covered Speech First's members' speech, including statements that "abortion is immoral, that the government should not be able to force religious organizations to recognize marriages with which they disagree, that affirmative action is deeply unfair, that a man cannot become a woman because he feels like one, that illegal immigration is dangerous, and that the Palestinian movement is anti-Semitic." *Id.* at 1125 (cleaned up).

96.     In *Khator*, Speech First challenged the University of Houston's harassment policy. That policy prohibited "subject[ing] an individual on the basis of their membership in a Protected Class to unlawful severe, pervasive, or persistent treatment" that either (1) "is humiliating, abusive, or threatening and denigrates or shows hostility or aversion towards an individual or group"; (2) "creates an intimidating, hostile, or abusive … environment"; or (3) "causes an unreasonable interference with an individual's academic or work performance." 603 F. Supp. 3d at 481 (cleaned up). The district court held that the policy was likely unconstitutional—and that Speech First likely had standing to challenge it—because it did "not comport with the standard adopted by the Supreme Court" in *Davis*. *Id.* at 482.

97.     In a recent Title IX rulemaking, the Department of Education studied the issue and found that harassment policies like the University's have been applied to protected speech. These policies have not only "infringed on constitutionally protected speech," but also have

led "'many potential speakers to conclude that it is better to stay silent.'" 85 Fed. Reg. at

30,164-65 & nn.738-39.

98.     FIRE has similarly advocated for the *Davis* standard and stressed that it's "nec-

essary to restore free speech to America's college campuses." *Why the Supreme Court's* Davis

*Standard Is Necessary to Restore Free Speech to America's College Campuses: Part I*, FIRE (Oct. 14,

2019), perma.cc/4KFG-634L (*FIRE Part I*); *Why the Supreme Court's Davis Standard Is Necessary*

*to Restore Free Speech to America's College Campuses: Part II*, FIRE (Oct. 24, 2019),

perma.cc/4QXD-4H2T (*FIRE Part II*). As FIRE explains, the *Davis* standard "was carefully

crafted by the [Supreme] Court to avoid putting educational institutions in a position where

they would have to infringe upon students' right to free expression in order to avoid liability

for their own actions, or lack thereof." *FIRE Part I*. The *Davis* standard is the "only viable

[standard offered] that can sufficiently protect freedom of expression while also prohibiting

real sexual harassment on college campuses." *FIRE Part II*.

## COUNT I
### Violation of the First and Fourteenth Amendments
### (Discriminatory-Harassment Policy)

99.     Plaintiff repeats and realleges each of the prior allegations in this complaint.

100.    The First Amendment prohibits public universities from adopting regulations

of students that are "so broad as to chill the exercise of free speech and expression." *Dambrot*

*v. Cent. Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). "Because First Amendment free-

doms need breathing space to survive, a state may regulate in the area only with narrow spec-

ificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). A public university must carefully craft its

regulations "to punish only unprotected speech and not be susceptible of application to

protected expression." *Id.* A regulation is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The Court must find such regulations facially unconstitutional because "the threat of enforcement of an overbroad [regulation] may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

101.    "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe*, 240 F.3d at 204. Rather, "[t]he right to provoke, offend and shock lies at the core of the First Amendment. This is particularly so on college campuses. Intellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular." *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). "[I]f it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988).

102.    The University's discriminatory-harassment policy is facially unconstitutional.

103.    While a university can prohibit harassment that amounts to "discrimination" against a protected class that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," *Davis*, 526 U.S. at 650, the University's harassment rule goes far beyond that. Its expansive terms and its refusal to adopt the speech-protective standard from *Davis* means it

reaches large swaths of protected speech. It then imposes content-based, viewpoint-based restrictions on that speech.

104.    The Supreme Court has consistently recognized the "substantial and expansive threats to free expression posed by content-based restrictions." *United States v. Alvarez*, 567 U.S. 709, 717 (2012). "Content-based regulations" are "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Accordingly, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

105.    "The First Amendment's hostility to content-based regulation extends" to "restrictions on particular viewpoints." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015). Policies cannot "suppress disfavored speech." *Id.* at 2229. Viewpoint discrimination is flatly prohibited. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019).

106.    By restricting offensive speech about personal characteristics such as race, ethnicity, or gender, the discriminatory-harassment policy is a content-based and viewpoint-based restriction on protected speech. The University has no compelling interest in suppressing the unfettered exchange of viewpoints.

107.    Even if the University could identify a compelling interest, its viewpoint-discriminatory ban is not narrowly tailored to further that interest. A policy that adopted the *Davis* standard verbatim is a narrower alternative that solves any legitimate interest the University might have. And the University's policy covers categories, including "veteran's status," that go beyond what federal antidiscrimination laws require. *See Fenves*, 979 F.3d at 337 n.16 (describing the constitutionality of such a policy as "self-evidently dubious").

108.    To the extent that the System's policies on "racial harassment" and "sexual harassment" have independent force, they are unconstitutional too for the same reasons.

109.    Defendants adopted these unconstitutional policies under color of state law.

## COUNT II
### Violation of the First and Fourteenth Amendments
### (Computer Policy)

110.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

111.    The University's computer policy prohibits students from using their student email accounts or the University's network "to affect the result of a local, state, or national election or to achieve any other political purpose (consistent with Texas Government Code §556.004)."

112.    Violations of the computer policy are punishable under the University's policies and can lead to the loss of network privileges.

113.    The computer policy is a content-based restriction on political speech—a category of expression where the First Amendment has "its fullest and most urgent application." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). The University's email accounts and internet networks are traditional public forums for students. *See Am. Future Sys., Inc. v. Penn. State Univ.*, 752 F.2d 854, 864 (3d Cir. 1984) (explaining that aspects of a college campus can be a traditional public forum for students, even if it's not for outsiders); *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (explaining that the internet is today's quintessential traditional public forum). Students can and do use these resources for personal and political speech. Content-based restrictions on speech in a traditional public forum must satisfy strict scrutiny. *Summum*, 555 U.S. at 469.

114.    "The First Amendment's hostility to content-based regulation extends … to prohibition of public discussion of an entire topic." *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015) (cleaned up). For instance, "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.* So too here.

115.    The University allows students to send emails about any issue of public debate *except* for "political purposes." That regulation is a classic content-based restriction. For example, the University's policy appears to ban a student from sending an email that says "support universal healthcare" or an email that says "re-elect Kirk Watson for Austin Mayor because he supports universal healthcare." Such broad restrictions cannot satisfy any level of scrutiny, much less strict scrutiny.

116.    To the extent that Texas Government Code §556.004 has independent force or compels the University's computer policy, Texas Government Code §556.004 is unconstitutional for the same reasons.

117.    Defendants adopted this unconstitutional policy under color of state law.

## COUNT III
### Violation of the First and Fourteenth Amendments: Void for Vagueness
### (Computer Policy)

118.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

119.    It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007); *see Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d

426, 442 (4th Cir. 2013) ("A law is unconstitutionally vague if it fails to establish standards for the government and public that are sufficient to guard against the arbitrary deprivation of liberty interests.").

120.    As to the first goal, "'[a] statute which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Cleveland Fire Fighters*, 502 F.3d at 551 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)); *see also Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274 (4th Cir. 2019) ("The purpose of the fair notice requirement is to enable citizens to conform their conduct to the proscriptions of the law."). "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" *Cleveland Fire Fighters*, 502 F.3d at 551 (quoting *Grayned*, 408 U.S. at 108-09).

121.    This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

122. The University's computer policy prohibits speech that "affect[s] the result of a local, state, or national election or … achieve[s] any other political purpose." But the policy does not define "political," let alone what is "similar" to a "political purpose." *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018) (faulting a policy for "not defin[ing] the term 'political,'" which "can be expansive"). The University provides no meaningful guidance about whether the ban only covers emails advocating for the election or defeat of specific candidates, whether it also applies to issue advocacy that is typically aligned with a certain party, whether it prohibits only student government campaigning, or whether it ropes in anything someone might deem political.

123. This vague standard deprives the average student of "a reasonable opportunity to understand what conduct [the policy] prohibits." *Hill v. Colorado*, 530 U.S. 730, 732 (2002); *see also, e.g.*, *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transportation*, 978 F.3d 481 (6th Cir. 2020) (concluding that a "political" restriction was unconstitutionally vague); *Ctr. for Investigative Reporting v. Se. Pa. Transportation Auth.*, 975 F.3d 300, 316 (3d Cir. 2020); *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179 (4th Cir. 2022); *Zukerman v. USPS*, 961 F.3d 431 (D.C. Cir. 2020).

124. To the extent that Texas Government Code §556.004 has independent force or compels the University's computer policy, Texas Government Code §556.004 is unconstitutional for the same reasons.

125. Defendants adopted this unconstitutional policy under color of state law.

**WHEREFORE**, Speech First respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A.    A declaratory judgment that the University's harassment policy—and any materially similar policy that applies at the University—violates the First and Fourteenth Amendments;

B.    A declaratory judgment that the University's computer policy—and any materially similar policy or law that applies at the University—violates the First and Fourteenth Amendments;

C.    A permanent injunction barring Defendants from enforcing the University's harassment policy and any materially similar policy that applies at the University;

D.    A permanent injunction barring Defendants from enforcing the University's computer policy and any materially similar law or policy that applies at the University;

E.    A preliminary injunction granting the relief specified above during the pendency of this action;

F.    Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

G.    All other relief that Plaintiff is entitled to.

Respectfully submitted,

Dated: April 13, 2023

_/s/ Cameron T. Norris_
J. Michael Connolly
Cameron T. Norris
James F. Hasson (TX Bar No. 24109982)
Thomas S. Vaseliou (TX Bar No. 24115891)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

## VERIFICATION

I, Cherise Trump, declare as follows:

1.   I am the Executive Director of Speech First, Inc., the plaintiff in this case.

2.   I have reviewed this complaint.

3.   For the allegations within my personal knowledge, I believe them all to be true.

4.   For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Speech First, including Students A, B, and C.

5.   I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 12, 2023

_____

Cherise Trump, Executive Director of
Speech First, Inc.