IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SPEECH FIRST, INC., | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:23-CV-00411 |
| | § | |
| BRIAN MCCALL, in his official capacity as | § | |
| Chancellor of the Texas State University | § | |
| System; KELLY DAMPHOUSSE, in his | § | |
| official capacity as President of Texas State | § | |
| University; ALEXANDRIA HATCHER, in | § | |
| her official capacity as Director of the | § | |
| Office of Equal Opportunity and Title IX | § | |
| for Texas State University; KEN PIERCE, | § | |
| in his official capacity as Vice President for | § | |
| Information Technology for Texas State | § | |
| University; DANIEL OWEN, in his official | § | |
| capacity as Chief Information Security | § | |
| Officer for Texas State University; EARL | § | |
| C. AUSTIN, GARRY D. CRAIN, ALAN | § | |
| TINSLEY, CHARLIE AMATO, SHIELA | § | |
| FASKE, DIONICIO FLORES, | § | |
| VERONICA HARLE, STEPHEN LEE, | § | |
| and WILLIAM F. SCOTT, in their official | § | |
| capacities as members of the Texas State | § | |
| University System Board of Regents, | § | |
| *Defendants.* | § | |

---

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

**TABLE OF CONTENTS**

I.   INTRODUCTION.................................................................................................................3

II.  FACTUAL BACKGROUND .............................................................................................4

III. STANDARD OF REVIEW.................................................................................................7

IV.  ARGUMENTS & AUTHORITIES ....................................................................................8

   A.   The Court Should Deny Speech First's Motion for Preliminary Injunction of the
   Discriminatory Harassment Policy....................................................................................8

      1.   Speech First lacks standing to challenge the discriminatory harassment policy because its
      members are not subject to discipline under these policies and the policies cannot reasonably be
      construed to "chill" their desired speech. ......................................................................................9

      2.   Texas State's discriminatory harassment policy is constitutional. ...........................................11

         a.   Texas State's policy, which regulates discriminatory conduct and speech incident to such
         conduct, is not overbroad. ......................................................................................................12

         b.   Though the policy is not a content-based regulation, it would, nonetheless, survive strict
         scrutiny....................................................................................................................................15

      3.   Texas State's Acceptable Use policy is constitutional.............................................................16

         a.   Texas State's Acceptable Use policy is a constitutional restriction on speech because the
         policy places reasonable, non-viewpoint restrictions on speech in a limited public forum. ....16

         b.   The Acceptable Use Policy is not void for vagueness because a reasonable person would
         understand the term "political purpose" as it is used in the policy...........................................19

   B.   Speech First cannot meet the other injunction factors.................................................20

V.   CONCLUSION ................................................................................................................21

# I.     INTRODUCTION

Speech First facially challenges two Texas State University policies it claims infringe on its members First Amendment rights.[1] The first challenge is to Texas State's definition of harassment contained in its policy on Prohibition of Discrimination—a definition modeled after well-established legal standards for harassing conduct under various state and federal laws—but which Speech First erroneously styles a content- and viewpoint-based restriction on conservative speech. Contrary to Speech First's assertions, the challenged definition contains a clear standard for the degree of discriminatory conduct required, requires that such conduct affect an individual by interfering with that individual's ability to work or participate in educational programs, and contains several additional constraints that ensure that no person's subjective offense or discomfort occasioned by controversial, constitutionally-protected speech could be considered actionable under the policy.

Despite a complete lack of evidence that its members would or could credibly fear punishment under the discriminatory harassment policy, Speech First argues that its student's subjective perceptions that some might find their self-described "unpopular" viewpoints offensive is sufficient to chill their speech. But a reasonable reading of the policy, supported by Texas State's evidence of how its administrators apply it, demonstrates that the policy cannot reasonably be construed to prohibit Speech First's members' desired speech. And while enjoining the policy would have no impact on Speech First's members whose desired speech does not fall within its scope, an injunction would hinder Texas State's compelling interest in preventing disruption in its education environment that infringes on the right of others.

The second challenged policy governs conditions on students and employee use of state-funded computer resources imposed by state law. Speech First fails in this facial challenge because

---

[1] Speech First nominally challenges an additional Texas State University System policy related to discriminatory harassment, but has not requested a preliminary injunction against enforcement of such policy. *See* Dkt. 1 at ¶ 108.

Texas State's information resources, specifically its university email system, is at most a limited public forum for which Texas State may impose content-based restrictions. The Acceptable Use Policy's prohibition on using information resources for political purposes is an appropriate content-based restriction, and the Policy's use of the term "political purposes" does not render it facially unconstitutional for vagueness. As the Policy expressly states, Texas State interprets that term consistent with its statutory origin, and Texas courts have already defined that term under Texas law. Thus, the Policy is readily understandable by a reasonable person and is not unconstitutionally vague.

## II.      FACTUAL BACKGROUND

Texas State University ("Texas State") is an institution of higher education of the State of Texas and, as such, acknowledges and embraces its role as a place of learning, discourse, and exploration in the "marketplace of ideas." *Healy v. James*, 408 U.S. 169, 180 (1972). As a state education agency and public employer, Texas State is also responsible for maintaining a productive education environment and equal education and employment opportunities. Texas State accomplishes these compelling interests, in part, by upholding state and federal laws that obligate it to intervene when students' or employees' civil rights are infringed by discrimination, including harassment based on characteristics protected by law such as race, sex, and religion.[2] As such, Texas State adopted, and continuously reviews, a Prohibition of Discrimination policy that balances its educational mission to facilitate the free exchange of ideas while ensuring the rights of students and employees to benefit from such programs is not disrupted by a discriminatory environment.[3]

The discriminatory harassment policy proscribes harassing *conduct*, much of which would not be considered expressive and has no First Amendment implications.[4] The policy also may proscribe

---

[2] Hatcher Decl. ¶ 3.

[3] Hatcher Decl. ¶ 4.

[4] Hatcher Decl. ¶¶ 8–9. Consider, for example, acts of vandalism, physical confrontations, blocking access to a student's use of dormitory bathrooms, and stalking-type behaviors such as repeatedly appearing at a student's dorm uninvited.

4

speech, but only when that speech falls within a definition of harassment that is well-established and has been widely employed in the civil rights context for decades without First Amendment concern.[5] *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 389-390 (2006).

The definition of harassment contains important limitations on the type of conduct (including speech) that can rise to the level of a policy violation: the conduct (or speech) must be (1) unwelcome; (2) severe or pervasive; (3) directed at an individual or group of individuals; (4) interfere with those individuals' work performance or ability to participate/benefit from the educational program or activity; (5) whether the conduct meets these standards must be judged both subjectively AND objectively; and (6) the context in which the conduct occurred must be taken into consideration ("totality of the circumstances").[6] Contrary to Speech First's contentions that the various elements of this definition infuse it with vagueness and overbreadth, they serve to limit—rather than expand—the policy's reach.[7]

At Texas State, the Office of Equal Opportunity ("OEO") is the administrative body charged with developing, overseeing, and implementing the discriminatory harassment policy.[8] The process for implementing the discriminatory harassment policy involves receiving a complaint about perceived discrimination and making an initial determination about whether the facts alleged in that complaint, if true, could constitute a policy violation.[9] Only if the OEO Director determines that a complaint states a plausible policy violation and there is sufficient information to proceed will the respondent be contacted and an investigation initiated.[10] If an investigation reveals a student violated the policy, the

---

[5] Hatcher Decl. ¶¶ 8–9 (policy standard for "harassment" comports with standard established in Title VII jurisprudence and under the Texas Education Code); *id.* at ¶¶ 6–7 (all complaints involving pure student speech since 2017 have been dismissed without investigation).
[6] Hatcher Decl. ¶ 8.
[7] Hatcher Decl. ¶ 8 (explaining that each element of harassment must be met in order to substantiate a policy violation).
[8] Hatcher Decl. ¶¶ 2–3.
[9] Hatcher Decl. ¶ 5.
[10] Hatcher Decl. ¶ 5.

OEO Director will refer the violation to the Dean of Students for a determination of appropriate conduct sanctions.[11]

Since 2017, OEO has received 28 complaints about student conduct under the discriminatory harassment policy. In all but one of those complaints, the OEO Director made the determination that the complaint did not warrant investigation and dismissed it without even notifying the student respondent or taking further action.[12] The complaint that was investigated, resulted in a finding of no violation.[13] A number of complaints involving student speech on controversial topics have been referred to OEO; however, in each of these cases, the OEO Director has made the determination that the conduct involved, even if true, did not rise to the level of a policy violation and dismissed the complaint.[14] In these instances, OEO did not contact or engage the student respondent in any way.[15] In one case involving a complaint about a student's statements opposing transgender rights, the OEO engaged the *complaining party* (an instructor) to educate them that such speech did not constitute harassment under university policy and to offer guidance about how to productively respond to controversial viewpoints in the classroom context.[16]

Since at least 2017, no student behavior consisting of the type of speech in which Students A, B, and C desire to engage has been determined to violate the discriminatory harassment policy, nor has any student been engaged in OEO's disciplinary process for such speech.[17] Texas State's OEO director confirmed that a complaint about a student speaking on the topics described in the declarations of Students A, B, and C—even if that speech was "heated, passionate, and targeted"— would not warrant engagement of the OEO process, let alone disciplinary action.[18]

---

[11] Hatcher Decl. ¶ 5.
[12] Hatcher Decl. ¶¶ 6–7.
[13] Hatcher Decl. ¶ 7.
[14] Hatcher Decl. ¶¶ 9–11.
[15] Hatcher Decl. ¶ 7.
[16] Hatcher Decl. ¶ 10.
[17] Id.
[18] Hatcher Decl. ¶ 12.

Texas State's Acceptable Use Policy specifies how its information resources may be used.[19] Under that policy, Texas State provides access to its information resources to only authorized users.[20] By accepting the account, users agree to abide the limitations placed on the information resources.[21] The policy reserves Texas State's right "at any time to limit, restrict, or deny access to its information resources."[22] The information resources are provided to users "for the purpose of accomplishing tasks related to the university's mission."[23] "Texas States computer information resources are not a public forum."[24] Texas State does not open its email system to the general public but only "provides official university email addresses and services to its students, faculty, staff, retirees, and organizational units for [official university communication] and to enhance the efficiency of educational and administrative processes."[25] "State law and university policy permit incidental personal use of Texas State's information resources."[26] Such personal use must not violate any applicable policies and statutes . . . [including] restrictions detailed in Section 5."[27] Such restrictions include "using Texas State's information resources to affect the result of a local, state, or notional election or to achieve any other political purpose."[28]

### III.    STANDARD OF REVIEW

A party seeking a preliminary injunction must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest." *Planned Parenthood of Hous.*

---

[19] Dkt. 4-11 at 1.
[20] Dkt. 4-11 at 4.
[21] Dkt. 4-11 at 4.
[22] Dkt. 4-11 at 4.
[23] Dkt. 4-11 at 4.
[24] Dkt. 4-11 at 5.
[25] Dkt. 4-11 at 5.
[26] Dkt. 4-11 at 5.
[27] Dkt. 4-11 at 4
[28] Dkt. 4-11 at 8.

*& Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005). "In considering whether to grant or deny preliminary injunctive relief, the district court 'must remember that a preliminary injunction is an extraordinary and drastic remedy,' and that '[t]he movant has a heavy burden of persuading the district court that all four elements are satisfied.'" *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). The decision to grant a preliminary injunction is to be treated as "the exception rather than the rule." *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975).

This is particularly true when a party seeks an order directing state officials to discontinue certain conduct, as considerations of federalism weigh heavily against interference by federal courts through the issuance of preliminary injunctions against state agencies. *Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985); *Parrott v. Livingston*, NO. 15-866, 2016 WL 4487918, at *1 (E.D. Tex. June 29, 2016). "[E]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative.'" *Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) (quoting *Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948)).

## IV.     ARGUMENTS & AUTHORITIES

### A. The Court Should Deny Speech First's Motion for Preliminary Injunction of the Discriminatory Harassment Policy.

Speech First's Complaint and preliminary injunction evidence fails to establish its standing to challenge Defendants' discriminatory harassment policies because they cannot show a credible threat of enforcement against their members for engaging in protected speech nor can they show that the subjective "chill" of free speech reported by their clients is objectively reasonable. Moreover, Speech First is unlikely to succeed on the merits because the policies at issue are neither vague nor overbroad. Rather, they serve the institution's compelling—and legally required—interest in preventing infringement on the rights of others to participate in its educational programs and are tailored to exclude the type of viewpoint expression and discourse on controversial matters in which Speech

First's members wish to engage. Lastly, though importantly, enjoining Texas State's enforcement of this policy will have no effect on Speech First's members—who's desired speech is not implicated by the policies—but will impede Texas State in it legal obligation to protect the civil rights of students and employees consistent with its educational mission and role as a facilitator of the exchange of ideas. Thus, the balancing of public and private interests disfavors an injunction.

> **1. Speech First lacks standing to challenge the discriminatory harassment policy because its members are not subject to discipline under these policies and the policies cannot reasonably be construed to "chill" their desired speech.**

Speech First seeks to establish associational standing through three members who are students at Texas State University—Students A, B, and C. To do so, Speech First must show, among other things, that "(a) its members would otherwise have standing to sue in their own right . . ." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 282 (1986). Speech First, thus, must show that Student A, B, or C has (1) suffered an injury in fact, (2) that is fairly traceable to the defendant[s' policies]; and (3) is likely to be redressed by a favorable decision. *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560-61 (1992). In the pre-enforcement context, a plaintiff must demonstrate (1) an intent to engage in the "conduct arguably affected with a constitutional interest;" (2) that the future conduct is arguably proscribed by the statute or rule at issue; and (3) that "the threat of future enforcement . . . is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014). Where, as here, a First Amendment claim is premised on chilling speech, plaintiffs must show a "specific present *objective* harm or a threat of specific future harm." *Hous. Chron. Pub. Co. v. City of League City*, 488 F.3d 613, 618–19 (5th Cir. 2007) (emphasis added). Mere "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or threat of specific future harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).

Speech First's member's fear of enforcement is not based on an objectively reasonable reading of the Prohibition on Discrimination policy or the enforcement apparatus that surrounds it. Speech

First suggests that any potential complainant's subjective feeling that their members' speech might meet one or more elements of the policy's harassment definition (i.e., that others may perceive their speech as "unwelcome," "hostile," or "intimidating" or may claim the speech "interfere[d] with their education or academic environment"[29]) does not reasonably make them subject to disciplinary process under that policy.  The most reasonable—and arguably only—interpretation of the policy is that each element is *required* to bring alleged conduct within the policy's scope. And, indeed, this is how the policy is actually interpreted and applied at Texas State.[30] It is simply not a fair reading that offensive or unpopular speech on matters of public interest would fall within the policy's definition of harassment merely because they could meet some, but not nearly all, required elements of the challenged definition.[31] For example, there is no allegation that the students intend to "direct" their speech toward any individual based on that individual's protected status. To the contrary, the students suggest they wish to engage others based on their "contrary views," not their protected status.[32] Nor has Speech First established how "robust intellectual debate[s]"—albeit on controversial topics— could be objectively "severe or pervasive" or objectively "interfere with [a classmate's] participation in educational programs."[33]

Furthermore, while Texas State does investigate and enforce incidents of discrimination— including discriminatory harassment—against its students and employees consistent with its obligations under state and federal nondiscrimination laws, Texas State does not have a "bias incident" policy or apparatus, the operation of which some courts have found could contribute to reasonable perceptions by speakers of unpopular viewpoints that they might be referred for discipline merely

---

[29] *See* Dkt. 4-2.
[30] Hatcher Decl. ¶ 8.
[31] Hatcher Decl. ¶ 12 (the speech in which students desire to engage does not fall withing the policy).
[32] Dkt. 4-2.
[33] The declaration by Speech First's Executive Director lists examples of retaliation against students across the country for expressing unpopular opinions and ideas, but none of these examples involves the application of Texas State's discriminatory harassment policy. Hatcher Decl., ¶ 13. In addition to being wholly irrelevant to the challenged policy, this evidence is hearsay (including hearsay opinions by special interest groups) and can be ignored by the Court.

because they offended someone. Taken as a whole and in context, Speech First's reading of the Prohibition of Discrimination to plausibly subject their members to discipline for speaking on disfavored viewpoints is not objectively reasonable.

### 2. Texas State's discriminatory harassment policy is constitutional.

Texas State's Prohibition on Discrimination is modeled on and hues to the definition of harassment and hostile environment established in various state and federal antidiscrimination laws, namely Title VII of the Civil Rights Act of 1964.[34, 35] Title VII obligates Texas State to protect its employees from discriminatory harassment based on race, color, sex, national origin, and religion—including such harassment by third parties, such as students.  29 C.F.R. 1604.11(e); *see also Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 322 (5th Cir. 2019), *as revised* (Feb. 7, 2019) ("[N]onemployees can be the source of the harassment . . . Customers are one example of third-party harassers."); *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (treating students as third-party harassers in Title VII claim brought by University employee). The policy's aim falls squarely within the type of expressive conduct education institutions may permissibly regulate under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, that which "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." 393 U.S. 503, 513 (1969).

All of the material elements of Texas State's discriminatory harassment policy are present in the Title VII hostile work environment jurisprudence. Under Title VII, harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Lauderdale v. Texas Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) ("Conduct that is not

---

[34] Hatcher Decl., ¶ 3.

[35] Texas State is also obligated to comply with state laws that similarly define discriminatory harassment, including the state's Title VII analog, Chapter 21 of the Texas Labor Code, *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (2004) ("[Chapter 21] is modeled after federal law with the purpose of executing the policies set forth in Title VII of the federal Civil Rights Act of 1964.").

severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."). "In determining whether an actionable hostile work environment claim exists, we look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonable interferes with an employee's work performance.'" *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).

### a. Texas State's policy, which regulates discriminatory conduct and speech incident to such conduct, is not overbroad.

Though the Supreme Court has never explicitly decided whether harassment, as defined by Title VII, is overbroad in violation of the First Amendment, the Court has suggested that Title VII is primarily a regulation of conduct (discrimination) and that, to the extent Title VII prohibits speech that effectuates discrimination, including discriminatory harassment, its aim is to prohibit not speech itself but the secondary effects of such speech:

> Since words can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets), a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech. Thus, for example, sexually derogatory "fighting words," among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices. Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.

*R.A.V. v. City of St. Paul, Minn.,* 505 U.S., 377 (1992) (cleaned up).

While *R.A.V.* cannot be read to create a categorical First Amendment exception for Title VII harassment, *see Saxe v. State College Area School Dist.*, 240 F.3d 200, 209-210 (3rd Cir. 2001), it suggests

that Title VII's prohibition on harassment does not have "a substantial number" of unconstitutional applications "judged in relation to the [policy's] plainly legitimate sweep" as needed to sustain an overbreadth challenge. *Serafine v. Branaman*, 810 F.3d 354, 364 (5th Cir. 2016). Indeed, Texas State has never applied its definition of discriminatory harassment to even initiate a disciplinary process against a student outside the context of discriminatory insults directed at a specific individual and arising from a personal dispute.[36]

Importantly, Speech First does not contend that Texas State is without power to constitutionally prohibit students from engaging in at least some speech-based discrimination.[37] *See Tinker,* 393 U.S. at 509. It merely disagrees about how narrowly defined the prohibited conduct must be to avoid unconstitutional overbreadth. Speech First erroneously suggests that the Supreme Court has already decided in *Davis v. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), that the Title VII standard is too loosely defined to pass First Amendment muster. This reliance on *Davis* is misplaced. First, *Davis* did not articulate the standard for what constitutes discriminatory harassment under Title IX; rather, it articulated the standard under which an education institution can be held liable for damages in an implied cause of action based on harassment perpetrated by a third party. *Davis*, 526 U.S. at 639– 40. Contrary to Speech First's assertion, this definition was crafted without reference to the First Amendment. While the Court could be construed as implying the *Davis* standard would not implicate student speech rights, it does not follow that the Court concluded—or even implied—that a marginally more expansive standard, such as the standard articulated in Title VII cases, could NOT pass First Amendment scrutiny.

At base, there are only two significant differences between Speech First's preferred standard from *Davis* and the one Texas State currently uses: (1) the *Davis* standard requires the conduct to be

---

[36] Hatcher Decl., ¶¶ 6–7.
[37] Dkt.. 4 at 9–12 (advocating for adoption of the *Davis* standard).

"severe" *and* "pervasive," whereas Texas State's policy requires the conduct be "severe *or* pervasive" and (2) the *Davis* standard requires the harassment to "effectively deny equal access to educational opportunity and benefits" whereas Texas State requires the harassment to "interfere with an individual's employment, education, academic environment, or participation in institution programs or activities AND creates an . . . environment that a reasonable person would find intimidating, offensive, or hostile." Both standards require an objective test, and Texas State's has the additional requirement of a subjective test, which ensures that a concrete, not merely hypothetical, harm or disruption must occur before any conduct or speech can be prohibited. Texas State's policy has additional requirements, such that the conduct be unwelcome, directed at a specific individual or group of individuals, and that the conduct must be judged in context of the particular circumstances in which it arises. These requirements ensure that in the vast majority of applications, if not all applications, the only pure speech prohibited by the policy is speech not entitled to First Amendment protection such as true threats and fighting words. *See, e.g., R.A.V.*, 505 U.S. 386–88; *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) ("mere utterance of an ethnic or racial epithet which engenders offensive feelings [would not] violate Title VII"); *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) ("[P]laintiffs must clear a high bar in order to satisfy the severe or pervasive test. . . . "[E]ven incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard.").

Speech First cannot convincingly explain why these marginal differences place Texas State's policy outside constitutional bounds. Nor have they convincingly articulated why consideration of the "totality of the particular circumstances"—a mere requirement to consider the context in which conduct or speech was made—offends First Amendment principles. Consideration of context is foundational to First Amendment jurisprudence, especially in determining whether certain speech merits constitutional protection or falls outside the First Amendment's guarantee. It is an absurd

14

suggestion that all circumstances should NOT be considered in determining whether certain speech creates an objectively hostile environment that interferes with another's ability to participate in education programs—or in determining whether certain speech is "so severe, persistent, and objectively offensive" that is effectively denies a person equal access to educational programs, for that matter.

Speech First points to holdings invalidating purportedly similar policies at other institutions. But these policies and the justification for the holdings are distinguishable. The policies in *Cartwright* and *Fenves*, for example, had several additional trappings not present in Texas State's policy. The policy in *Cartwright* included language that the policy should be "read broadly" and prohibited students from "encouraging," "condoning," or "failing to intervene" in harassing conduct. *Cartwright*, 32 F.4th at 1121. The Fifth Circuit in *Fenves* did not squarely address whether the specific policy language similar to Texas State's discriminatory harassment policy was facially unconstitutional, but rather reversed the district court's dismissal of the case on standing grounds focusing largely on the chilling effects of other challenged policies. *Speech First v. Fenves*, 979 F.3d 319 (5th Cir. 2020). Furthermore, both *Fenves* and *Cartwright*, highlighted the chilling effect of the universities' use of "bias response teams," which implicated a much broader swath of speech than that prohibited by Texas State's Prohibition on Discrimination. *Cartwright*, 32 F.4th at 1116; *Fenves*, 979 F.3d at 325, 338 (university's bias response team designed to fill "potential gaps" in other policies).

### b. Though the policy is not a content-based regulation, it would, nonetheless, survive strict scrutiny.

This Court need not analyze whether Texas State's policy satisfies strict scrutiny as a content- or viewpoint-based restriction on speech because the policy falls squarely within ambit of permissible regulation of expressive conduct aimed at maintaining a functional education environment and preventing infringement on the rights of others. *Tinker*, 393 U.S. 503, 506 (acknowledging that in the

education context, rights must be viewed in the "in light of the special characteristics of the school environment."). However, Texas State's policies also survive strict scrutiny. Preserving students' equal access to and ability fully participate in educational programs by preventing discriminatorily hostile education environments is a compelling interest. *Bd. of Directors of Ratary Intern. v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (eliminating discrimination is a compelling state interest "of the highest order"); *see also Saxe v. State College Area School Dist.*, 240 F.3d 200, 209-210 (3rd Cir. 2001) ("[P]reventing discrimination in the workplace—and in the schools—is not only a legitimate, but a compelling, government interest."). The policy is also narrowly tailored to that end. The policy, as written, is aimed at reaching only pure speech that "severe or pervasive" and objectively interferes with another individual's work or education environment and subjects them to a hostile environment based on discrimination. This standard has been consistently interpreted as a high bar including "only the most extreme harassment." *Magellan v. McAleenan*, 2020 WL 13561344 *4, (W.D.Tex Oct. 7, 2020) (collecting Fifth Circuit cases).  Furthermore, Texas State's policy regulates only the type of speech incidental to discriminatory conduct or speech in the form of fighting words and true threats that itself are not subject to First Amendment protection. *R.A.V.*, 505 U.S. at 389.

### 3.  Texas State's Acceptable Use policy is constitutional.

#### a.  Texas State's Acceptable Use policy is a constitutional restriction on speech because the policy places reasonable, non-viewpoint restrictions on speech in a limited public forum.

First Amendment jurisprudence has defined the government's ability to place restrictions on speech by forum. "There are two broad categories of forums: (1) traditional and designated public forums and (2) limited public forums and nonpublic forums." *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020) (citing *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344_47 (5th Cir. 2001)). "Traditional public forums are places such as sidewalks, streets, and parks that have traditionally been devoted to assembly or debate." *Id.* (citing *Chiu*, 260 F.3d at 344). "Designated public

forums are places that the government has designated for the same widespread use as traditional public forums." *Id.* (citing *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010)).

"Limited public forums are places that the government has opened for public expression of particular kinds or by particular groups." *Id.* (citing *Chiu*, 260 F.3d at 346). "Nonpublic forums are forums that are not open for public communication by tradition or designation." *Id.* (citing *Chiu*, 260 F.3d at 347). "The government can restrict speech in a limited public forum or nonpublic forum as long as the restriction is (1) reasonable in light of the purpose served by the forum and (2) does not discriminate against speech on the basis of viewpoint." *Id.* (citing *Chiu*, 260 F.3d at 346–47) The Fifth Circuit has not decided which type of forum is created by a state university email system. *White Buffalo Ventures, LLC v. Univ. Tex. Austin*, 420 F.3d 366, 374 (5th Cir. 2005). However, the United States Supreme Court has held that a school's mail facilities, even if open to certain non-school uses, are a nonpublic forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46–47 (1983).

Texas State's information resources are not traditional or designated public forums as they are not open to the general public for speech either by tradition or designation. The policy makes clear that Texas State's information resources are not traditional or designated public fora. Because the information resources are not open "for indiscriminate use by the general public," they cannot be traditional or designated public fora.[38] *See Perry Educ. Assn.*, 460 U.S. at 45. Moreover, Texas State "may close it to all but official business if it chooses" further supporting the position that the University's information resources are not traditional public fora.[39] *Id.* at 46–7 (citing this is not arise to "a situation in which a public school purports to allow students to express their own views or sentiments" thereby creating a limited public forum. *See Nurre v. Whitehead*, 559 U.S. 1025, 130 S.Ct. 1937, 1939 (2010). Instead, any person's use is only permitted to be incidental to official university purposes and may not

---

[38] Dkt. 4-11 at 4.
[39] Dkt. 4-11 at 4.

violate university policies including restrictions on using the information resources for political purposes.[40] The fact Texas State's information resources are "not open for public communication by tradition or designation" but are limited to only authorized users associated with Texas State suggests they are nonpublic fora.[41] *See Freedom from Religion*, 955 F.3d at 426.

Even if the Court considers the incidental personal use as opening up Texas State's information resources to something more than a nonpublic forum, they are at most a limited public forum. "There is no question that [a school], like the private owner of property, may legally preserve the property under its control for the use to which it is dedicated." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390 (1993). That Texas State's Acceptable Use Policy reserves the information resources for "certain groups [students, faculty, staff, retirees, and organizational units][42] or for the discussion of certain topics [official university business and expressly excluding political purposes][43]" could support finding it a limited public for a but no more. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (internal alterations added).

Since Texas State's information resources constitute a nonpublic or limited public forum, the only question that needs to be answered regarding the Accepted Use policy is whether it is reasonable in light of the purpose for which the information resources serve.[44] *Perry Educ. Ass'n*, 460 U.S. at 49. The State has a legitimate interest in preventing its information resources from being utilized to influence elections and other "political purposes." *Id.* (*citing U.S. Postal Serv. v. Council of Greenburgh Civil Associations*, 453 U.S. 114, 129 (1981)). The reasonableness of the Accepted Use Policy is demonstrated by the alternative channels that remain open for students to engage in the political discussions they

---

[40] Dkt. 4-11 at 5.
[41] Dkt. 4-11 at 4.
[42] Dkt. 4-11 at 5.
[43] Dkt. 4-11 at 5, 8.
[44] Speech First argues (and Texas State agrees) that the prohibition on using the information resources for political purposes in the Acceptable Use Policy is a content-based regulation. Because Speech First does not argue the Policy is viewpoint-based, Texas State does not brief that issue here.

would like to engage in. *Perry Educ. Ass'n*, 460 U.S. at 53. Students are free to try and garner support for political purposes that they want using their own resources and means, including private email accounts that are free of charge and widely avaialable.

> **b. The Acceptable Use Policy is not void for vagueness because a reasonable person would understand the term "political purpose" as it is used in the policy.**

A law is not void for vagueness unless it "is impermissibly vague in all of its applications." *Hoffman Estates*, 455 U.S. at 497. A law need not "delineate the exact actions a [person] would have to take to avoid liability." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008). As the Supreme Court has put it, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1891 (2018). "[O]nly a reasonable degree of certainty is required" for a statute to survive a vagueness challenge. *Roark & Hardee*, 522 F.3d at 552–53.

 "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)); *see also SisterSong*, 40 F.4th at 1328 ("To be sure, there might be vague applications of that definition in other provisions of the Georgia Code, but challenges to those applications—like the arguments . . . about potential applications to constitutionally protected conduct—are properly brought in an as-applied manner."). Speech First has failed to meet this high burden.

The prohibition on using Texas State's information resources for political purposes contained in the Acceptable Use Policy is not unconstitutionally vague. While the Policy does prohibit using "information resources to affect the result of a local state or national election or to achieve any other political purpose" [Dkt. 4-11 at 8], Speech First fails to mention that the Policy qualifies the prohibition by construing it "consistent with Texas Government Code § 556.004." Texas courts have

already interpreted the term "political purpose" to mean "purposes similar in kind or nature to achieving or aiding the nomination or election of candidates." *Texas Uniting for Reform & Freedom v. Saenz*, 319 S.W.3d 914, 925 (Tex. App.—Austin 2010). Thus, the Acceptable Use Policy prohibits the use of the information resources to achieving or aiding the nomination or election of candidates, not the ephemeral expansive meaning prescribed by Speech First.

Any reasonable person could understand the prohibited conduct in § 556.004 and be aware of what the prohibited conduct is. To void the policy for being vague on its face would not only be akin to voiding § 556.004 itself but also the Texas court opinion that has interpreted the term Speech First contends is unconstitutionally vague. Because the Acceptable Use policy qualifies the term "political purpose" by constraining it to be consistent with § 556.004, and "political purpose" as used in § 556.004 has already been interpreted by Texas courts, the Acceptable Use policy is not void for vagueness.

Furthermore, Speech First cannot meeting the required showing to support a facial challenge to the prohibition against using state resources to affect elections. To succeed on a facial challenge, a plaintiff "must 'establish that no set of circumstances exist under which the [law] would be valid', or show that the law lacks 'a plainly legitimate sweep.'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021). Texas State's policy and the statute underlying it apply not only to student use of state information resources, but also state employee use of such resources. In most applications to state agencies, such a prohibition will apply to state empoyees' use of information resources and other state-funded programs for state use, rather that student's use of such programs for incidental private use. Thus, the policy and statute have a plainly legitimate sweep that would prevent a facial challenge.

### B.  Speech First cannot meet the other injunction factors.

Speech First's members have nothing to fear in terms of being punished for the conduct they wish to engage in because the discriminatory harassment policy does not prohibit their desired speech.

20

Enjoining Texas State from enforcing the policy does, however, impede its ability to protect its employees and students from discrimination that affects their ability to participate in education programs and disserves the public interest.

While the Accepted Use Policy does prohibit the use of Texas State's "information resources to affect the result of a local, state, or national election or to achieve any other political purpose," Speech First's members are free to use any other means to send their politically oriented emails such as by using their own personal emails or simply handing out pamphlets on campus that express their viewpoints on those topics. Ultimately, Speech First's members have ways to engage in the conduct they declare they want to without Texas State's policies affecting that, so there is no irreparable harm that they would suffer by denying the preliminary injunction.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Speech First's Motion for Preliminary Injunction.

Respectfully submitted.

JOHN SCOTT
Provisional Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Deputy Chief for General Litigation Division

*/s/ William D. Wassdorf*
Texas Bar No. 24060998
Deputy Chief
William D. Wassdorf

Texas Bar No. 24103022
General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
Ryan.Kercher@oag.texas.gov
Will.Wassdorf@oag.texas.gov

***Counsel for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2023 a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

/s/ *William D. Wassdorf*
William D. Wassdorf