UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| Speech First, Inc., | 1:23-cv-411-DAE |
|      *Plaintiff*, | |
| v. | |
| McCall, et. al, | |
|      *Defendants*. | |

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Before the Court is Plaintiff Speech First, Inc.'s ("Speech First" or "Plaintiff") Motion for Preliminary Injunction (the "Motion") to prevent Chancellor of the Texas State University System Brian McCall and other university officials (collectively, "Defendants" or "the University") from continuing to enforce the University's discriminatory-harassment policy and computer policy. (Dkt. # 4.)  Speech First's Motion was filed on April 14, 2023.  (Id.)  The University's Response was filed July 6, 2023.  (Dkt. # 22.)  Speech First's Reply was filed July 12, 2023.  (Dkt. # 26.)  The University filed a status report regarding alterations to the discriminatory-harassment policy and computer policy on August 28, 2023.  (Dkt. # 30.)  The Court held a hearing on this matter on August 30, 2023.  After careful consideration, for the reasons that follow, the Court **GRANTS in part and DENIES in part** the Motion for Preliminary Injunction (Dkt. # 4.)

BACKGROUND

On April 13, 2023, Speech First brought a civil action under 42 U.S.C. § 1983, alleging that the University's discriminatory-harassment and computer policies violate students' First and Fourteenth Amendment rights.  (Dkt. # 1.)  The following day, Speech First filed the instant Motion, requesting the University be enjoined from enforcing these policies while the litigation proceeds.  (Dkt. # 4.)  The case was transferred to the undersigned on April 21, 2023.  (Dkt. # 11.)

Speech First is a "nationwide membership organization dedicated to preserving human and civil rights secured by law, including the freedom of speech."  (Dkt. # 4 at 12.)  Speech First engages in targeted litigation against speech codes at universities across the country, recently including Oklahoma State University, the University of Houston, and Virginia Tech.  See Court Battles, Speech First, perma.cc/7NST-B84H (last accessed July 18, 2023).  Speech First's case rests on the allegations of unnamed Students A, B, and C, who are members of Speech First, current students at Texas State University, and purveyors of "views that are unpopular, controversial, and in the minority on campus."  (Dkt. # 4 at 12.)

On August 28, 2023, the University submitted a status update to the Court that detailed changes to its discriminatory-harassment policy and computer policy. (Dkt. # 30). The Court rules on the updated policies.

<u>DISCUSSION</u>

The University has significantly altered its discrimination-harassment policy since Speech First moved for a preliminary injunction. (Dkt. # 30.) The Court first addresses the changes to the policy. The Court then turns to the University's challenge to Speech First's associational standing to bring a case regarding the discriminatory-harassment policy.

I.    <u>Discriminatory-harassment Policy</u>

The original University policy "forbid[] discrimination in any university activity or program." (Dkt. # 4-6 at 2.) This discrimination policy defined "[h]arassment" as "a form of discrimination consisting of unwelcome verbal, written, graphic, or physical conduct that" both:

>    a.    is directed at an individual or group of individuals because of their race, color, national origin, age, sex, religion, disability, veterans' status, sexual orientation, gender identity, or gender expression; and
>
>    b.    is sufficiently severe or pervasive so as to[:]
>
>        [i]    interfere with an individual's employment, education, academic environment, or participation in institution programs or activities; and

> [ii]   create[] a working, learning, program, or activity
> environment that a reasonable person would find intimidating,
> offensive, or hostile.

(Id. at 2-3.)  The conduct must have been "targeted at the individual or group based

on a protected class," and must have been both objectively and subjectively

harassing in nature.  (Id. at 3.)  The harassment need not have "result[ed] in a

tangible injury," and need not have been "targeted at a particular individual."  (Id.)

Finally, whether the alleged conduct constituted prohibited harassment depended

on the totality of the circumstances.  (Id.)

During the pendency of this litigation, the University significantly altered its

discrimination-harassment policy.[1]  The changes relevant to Speech First's

concerns are as follows:

1. Addition of Section 04. First Amendment Rights as follows:

   04.01 Freedom of speech and principles of academic freedom are
   central to the mission of institutions of higher education.
   Constitutionally protected expression cannot be considered
   Discrimination or Harassment under this Policy.

2. Addition and modification of the following sections relating to the
   definition of Harassment:

   05.01 Protected Class – a class of persons who are protected under
   applicable federal or state laws against Discrimination and

---

[1] The Court notes that Speech First raised the issue of voluntary cessation at the
August 30, 2023, hearing. However, the University gave no indication they intend
to go back to the former policy, nor did Speech First present any evidence
indicating such. Moreover, the University represented to this Court that it does not
intend to return to the original policy, and this Court accepts their representation as
sincere.

Harassment on the basis of race, color, sex, pregnancy, gender identity, sexual orientation, gender expression, religion, age, national origin, ethnicity, military or veteran status, disability, genetic information, or any other legally protected basis.

~~02.02~~ 05.03 Harassment – a form of discrimination consisting of ~~unwelcome~~ verbal, graphic, ~~written,~~ or physical conduct that either:

a.  ~~is directed at an individual or group of individuals because of their race, color, national origin, age, sex, religion, disability, veterans' status, sexual orientation, gender identity, or gender expression; and~~ subjects an employee on the basis of their membership in a Protected Class to unwelcome conduct that is severe or pervasive enough to alter the conditions of the employee's employment and create a hostile or abusive working environment; or

b. ~~is sufficiently severe or pervasive so as to interfere with an individual's employment, education, academic environment, or participation in institutional programs or activities; and creates a working, learning, program, or activity environment that a reasonable person would find intimidating, offensive or hostile.~~ subjects a student on the basis of their membership in a Protected Class to severe, pervasive, an objectively offensive treatment that denies the student equal access to education.

~~To constitute prohibited harassment, the conduct must be directed at the individual or group based on a protected class, Conduct not based on one of the protected classes outlined in the definition will not be actionable under this policy.~~

And an individual's subjective belief that behavior is intimidating, hostile, or offensive, in and of itself, is not sufficient to establish Discrimination or Harassment. ~~To constitute prohibited harassment, t~~The ~~conduct~~ behavior must satisfy the standard for Discrimination or Harassment from ~~be~~ both a ~~obj~~subjective~~ly~~ and ~~su~~objective~~ly harassing in nature~~ perspective. ~~Harassment does not have to be targeted at a particular individual in order to create a harassing environment, nor must the conduct result in a tangible injury to b considered a~~

~~violation of this policy.~~ In determining ~~Ww~~hether ~~the alleged conduct constitutes prohibited~~ Discrimination or ~~hH~~arassment has occurred, ~~depends on the totality of the particular circumstances including~~ the university will examine the context, nature, scope, frequency, ~~and~~ duration ~~of the conduction in question,~~ and ~~the~~ location ~~and context in which it occurs~~ of incidents, ~~and~~ as well as the ~~status~~ relationships of the individuals involved, and apply the appropriate standard according to the applicable complaint resolution procedures.

(Dkt. # 30 at 2–3).[2]

The University "encourages its faculty, staff, students, and guests" to report all violations that they "learn of," but requires anyone in a supervisory position to do so.  (Dkt. # 4-6 at 4.)  As a general matter, after a complaint of discriminatory harassment is filed, the Director of the Office of Equal Opportunity and Title IX "investigate[s]" the allegations and issues findings within 90 days of the report. (Id. at 7.)  The University "may impose . . . sanctions," against students found to have violated the policy, including "disciplinary action up to and including dismissal from the university."  (Id. at 10.)

II.    Standing

"A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue."  Speech First, Inc. v. Fenves, 979 F.3d 319, 329 (5th

---

[2] The University notes the revisions to the definition of Harassment "are substantially identical to the definition of Harassment adopted by the University of Houston as part of a negotiated settlement of Speech First's claims" in Speech First's lawsuit against the University of Houston.  (Dkt. # 30 at 3; Dkt. # 30–2).

Cir. 2020), as revised (Oct. 30, 2020).  At earlier stages of litigation, "the manner and degree of evidence required to show standing is less than at later stages."  Id. at 329-30.  Article III of the Constitution limits "[t]he judicial power of the United States" to "cases" or "controversies."  To state a case or controversy, a plaintiff must establish standing.  Arizona Christian School Tuition Organization v. Winn, 563 U. S. 125, 133 (2011).  Standing requires a plaintiff to demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, 578 U. S. 330, 338 (2016).  At the preliminary injunction stage, "the movant must clearly show only that each element of standing is likely to obtain in the case at hand."  Fenves, 979 F.3d at 330 (emphasis added).

Because Speech First seeks a preliminary injunction on behalf of its members, it must "clearly show" that it "likely" has associational standing to bring its case on the merits.  See id.  Speech First satisfies that requirement if it shows a likelihood that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock, 477 U.S. 274, 282 (1986) (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)).

7

Only the first requirement of associational standing is at issue in this case, and the University only contests standing as to the discriminatory-harassment policy challenge.   (Dkt. # 22 at 9.)  Thus, Speech First must show that at least one of its members has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  See Spokeo, 578 U. S. at 338

A.    Injury in fact

In the First Amendment context, a plaintiff has suffered an injury in fact if he (1) has an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) his intended future conduct is "arguably . . . proscribed by [the policy in question]," and (3) "the threat of future enforcement of the [challenged policies] is substantial."  Fenves, 979 F.3d at 330 (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 161–64 (2014)).  Speech First must clearly show a likelihood that at least one of its members meets all three requirements.  Id.  In an analogous case brought by Speech First against the University of Texas at Austin, the Fifth Circuit found that injury in fact existed based on three students' stated intention to engage in controversial political speech and "fear that their speech may violate University policies."  Id., at 331, n.7. While the three unnamed students' intended speech here is analogous to those in

8

Fenves, the discriminatory-harassment policy, as updated, is not. Nevertheless, the Court finds Speech First has established injury in fact.

      1.    <u>Speech First's Intended Conduct is Arguably Affected with a Constitutional Interest</u>

The students in this case "want[ ] to engage in open and robust intellectual debate with [ ] fellow students" about their views: that illegal immigration, abortion, and gay marriage are wrong, that "there is no such thing as a 'gender spectrum,'" and that "affirmative action . . . is just old—fashioned racism by another name." (Dkts. ## 4-2 at 1-2; 4-3; 4-4.) The Court finds these allegations sufficient to allege that Speech First's student members intend to engage in a course of conduct arguably affected with a constitutional interest, namely, political speech. <u>Susan B. Anthony List</u>, 573 U.S. at 162 ("Because [their] intended future conduct concerns political speech, it is certainly 'affected with a constitutional interest.'").

      2.    <u>Speech First's Intended Future Conduct is Arguably Proscribed by the University Policy</u>

Speech First must show that its members' constitutionally protected speech "is arguably proscribed, or at least arguably regulated" by the updated discriminatory-harassment policy. <u>Fenves</u>, 979 F.3d at 332. The policy at issue in Fenves required verbal harassment to be "sufficiently severe, pervasive, or persistent to create an objectively hostile environment," to "personally describe" or

be "personally directed to one or more specific individuals," and noted that such harassment "is often based on the victim's appearance, personal characteristics, or group membership, including but not limited to [protected characteristics]." 979 F.3d at 323. The policy at issue here proscribes verbal, graphic, or physical conduct that, on the basis of their membership in a Protected class, subjects (1) an employee to unwelcome conduct that is severe or pervasive enough to alter the conditions of the employee's employment and create a hostile or abusive working environment; or (2) a student to severe, pervasive, and objectively offensive treatment that denies the student equal access to education. (Dkt. # 30 at 3.)

The University's updated policy does not raise issues identical to those in Fenves, in which the policy proscribed speech "directed at" an individual based on race, sexual orientation, national origin, and other protected classes that "interefer[ed] with or diminishe[d] the victim's ability to participate in or benefit from the services, activities, or privileges provided by the University." 979 F.3d at 323. Speech First's student members' expressions would only be barred under the University's policy if they denied a student equal access to education. Merely interfering with or diminishing access to services, activities, or privileges of the University is not enough. Moreover, that the speech may be directed at an individual based on membership in a protected class or may be subjectively

offensive is not enough to run afoul of the University's updated policy.  (Dkt. # 30 at 2–3.)

However, the strength and vigor of Speech First's student members' arguments, if "frequently and repeatedly" voiced to other students, as intended, could certainly interfere with individuals' participation at the University and create an objectively offensive or hostile environment that threatens equal student access to education.  (See Dkt. # 4-2 (stating intention to speak "frequently and repeatedly" on several controversial issues and that "these conversations will be heated, passionate, and targeted").)  For example, Student A wants to express the belief that "affirmative action . . . is just old-fashioned racism by another name," Student B would share the perspective that "marriage is only between a man and a woman," and Student C would voice the opinion that the government should not extend "already-strained support systems to those who do not have a right to be here."  (Dkts. ## 4-2-4-6.)   These statements, if consistently repeated, could chill student participation in and outside the classroom.  And the student-members provide reason to believe their speech will be pervasive.  Student A, for instance[3] states her desire to speak directly to "a classmate or another member of the university community" with "contrary views about these and other controversial

_____

[3] Student B and Student C's declarations parrot the same language.

topics," in order to change their minds on the subject, and she indicates that "many of these conversations will be heated, passionate, and targeted." (Dkt. # 4-2 at 2-3.) She expresses her desire "to talk frequently and repeatedly on these issues." (Id. at 2.) The repetition of these statements has the potential to rise to a violation of Title IX by constituting conduct "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education." Davis v. Monroe County Board of Education, 526 U.S. 629, 652 (1999). As a result, the Court finds Speech First's intended future conduct is arguably proscribed by the University policy.

                    i.     Whether the Threat of Future Enforcement is Substantial

        Plaintiffs making a First Amendment claim premised on chilling speech must show a "specific present objective harm or a threat of specific future harm." Hous. Chron. Pub. Co. v. City of League City, 488 F.3d 613, 618–19 (5th Cir. 2007) (emphasis added). Mere "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or threat of specific future harm." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 418 (2013). Plaintiffs must show either "a history of past enforcement" or that they "belong[ ] in a class subject to the challenged policies" to demonstrate it is clearly likely that the future threat of enforcement of the challenged policy is substantial. Fenves, 979 F.3d at 335.

While the University does not contest that it "does investigate and enforce incidents of discrimination—including discriminatory harassment" consistent with its policies, it argues that "[s]ince at least 2017, no student behavior consisting of the type of speech in which Students A, B, and C desire to engage has been determined to violate the discriminatory harassment policy, nor has any student been engaged in [Office of Equal Opportunity] disciplinary process for such speech."  (Dkt. # 22 at 6, 10-11.)[4]  Speech First responds that "'past enforcement . . . can assure standing,' [but] its absence does not 'doom' standing." (Dkt. # 26 at 5 (citing Fenves, 979 F.3d at 335).)  The Court agrees; Fenves forecloses the University's non-enforcement argument.

As in this case, university officials in Fenves disclaimed any knowledge of instances in which "the University speech policies have been enforced against the speech topics described by Speech First."  979 F.3d at 336. But the Fifth Circuit held that "[w]here the policy remains non-moribund" and "the students' speech is arguably regulated by the policy, there is standing."  Id. at 336-37.  There is no evidence indicating the discriminatory-harassment policy is

---

[4] The University also argues that the University lacks "a 'bias incident' policy or apparatus," from which speakers of unpopular viewpoints might reasonably fear discipline merely by offending someone.  Such mechanisms may be sufficient, but not necessary; in Fenves, the Fifth Circuit's decision did not turn on the existence of the bias-reporting mechanism.  See 979 F.3d at 336-37.

moribund: the University received 28 complaints about student conduct under the discriminatory-harassment policy since 2017, notwithstanding the fact that only one was ultimately found to warrant further investigation.  (Dkt. # 22 at 6.)  And like in <u>Fenves</u>, the University's disavowals of any intention to enforce the policy against the type of conduct described by the student-members does not reduce the threat that the policy "can in fact cover speech otherwise protected by the First Amendment."  <u>Fenves</u>, 979 F.3d at 337.  Speech First has therefore established that there is a clearly likely substantial threat of enforcement of the discriminatory-harassment policy.

   B. <u>Causation and Redressability</u>

   As in <u>Fenves</u>, "[t]he causation and redressability prongs of the standing inquiry are easily satisfied here."  979 F.3d at 338 (citing <u>Ctr. For Indiv. Freedom v. Carmouche</u>, 449 F.3d 655, 661 (5th Cir. 2006)).  After all, "[p]otential enforcement of the [challenged policies] caused [Speech First's members'] self-censorship, and the injury could be redressed by enjoining enforcement of [those policies]."  <u>Id</u>.  Accordingly, Speech First has standing to seek a preliminary injunction.

III. <u>Computer Policy</u>

   In relevant part, the University's original Policy No. 04.01.07 ("the computer policy"), prohibited "using Texas State's information resources to affect

the result of a local, state, or national election or to achieve any other political purpose (consistent with Texas Government Code § 556.004)." (Dkt. # 4-11 at 8.) "Information resources" include "any device that connects to or communicates electronically via the institutional network," as well as the "official university email addresses and services" offered to its students, faculty, staff, retirees, and organizational units. (Id. at 3, 5.) Failure to adhere to this policy "may lead to the revocation of a user's Texas State [account], suspension of elevated access privileges, suspension, dismissal, or other disciplinary action by the university, as well as referral to legal and law enforcement agencies." (Id. at 9.)

The updated policy prohibits:

> using Texas State's information resources to influence the election or nomination of a person for a state, local, or federal office or for similar partisan political activities affect the result of a local, state, or national election or to achieve any other political purpose (consistent with Texas Government Code §556.004);

(Dkt. # 30 at 4.) The University argues these revisions "clarify the scope of the statutory limitation on the use of state information resources for partisan political purposes consistent with binding precedent interpreting Texas Government Code § 556.004." (Id. citing Texas Uniting for Reform & Freedom v. Saenz, 319 S.W.3d 914, 925 (Tex. App.—Austin 2010, pet. denied)). However, this statute regulates the political actions of state officers and employees — there is no

15

requirement to regulate non-employee student political conduct.  See e.g. Texas

Government Code § 556.004.

IV.    Preliminary Injunction

The purpose of a preliminary injunction is to preserve the relative positions

of the parties until a trial on the merits can be held.  Univ. of Tex. v. Camenisch,

451 U.S. 390, 395 (1981).  A preliminary injunction is an "extraordinary and

drastic remedy," which is never awarded as a right.  Munaf v. Geren, 553 U.S. 674,

689–90 (2008).  To obtain a preliminary injunction, a plaintiff must demonstrate

(1) a substantial likelihood of success on the merits; (2) a substantial threat of

irreparable harm if the injunction does not issue; (3) that the threatened injury

outweighs any harm that will result if the injunction is granted; and (4) that the

grant of an injunction is in the public interest.  Moore v. Brown, 868 F.3d 398,

402–03 (5th Cir. 2017) (per curiam); FED. R. CIV. P. 65.  Normally, if a party

cannot prove all four elements, a court must deny the injunctive relief since "[t]he

decision to grant a preliminary injunction is to be treated as the exception rather

than the rule."  Miss. Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d

618, 621 (5th Cir. 1985).

Speech First argues that it is likely to prevail on its First and

Fourteenth Amendment challenges to the discriminatory-harassment policy and the

16

computer policy because both policies are facially unconstitutional.  (Dkt. # 4 at 9-18.)  The University contends that Speech First is unlikely to prevail on both claims because both policies survive constitutional scrutiny.  (Dkt. # 22 at 11-19.) The Court address the First Amendment concerns with each policy in turn.

    A.    <u>Likelihood of Success on the Merits – Discriminatory-harassment Policy</u>

Speech First contends that the discriminatory-harassment policy is overbroad, impermissibly viewpoint-based, content-based, and fails strict scrutiny.

    1.    <u>Overbreadth</u>

The overbreadth doctrine is designed "to prevent the chilling of protected expression."  <u>Massachusetts v. Oakes</u>, 491 U.S. 576, 584 (1989).  A policy is overbroad when "a substantial number of its applications are unconstitutional, judged in relation to the [policy's] plainly legitimate sweep."  <u>Serafine v. Branaman</u>, 810 F.3d 354, 364 (5th Cir. 2016) (cleaned up).

Speech First argues that the line drawn by the Supreme Court about harassment in <u>Davis v. Monroe County Board of Education</u>, 526 U.S. 629 (1999) controls.  In <u>Davis</u>, the Court held that a student had a damages action against the school board for the student-on-student harassment she had endured.  <u>Id</u>. at 633. According to Speech First, the <u>Davis</u> court delineated a narrow definition of actionable harassment—including verbal harassment—under Title IX: conduct "so

severe, pervasive, and objectively offensive that it denies its victims the equal access to education." Id. at 652.  The Court excluded from harassment "a single instance of one-on-one peer harassment," even if "sufficiently severe." Id. at 652-53.  The updated discriminatory-harassment policy in this case mirrors the Davis standard, requiring the conduct be so "severe, pervasive, and objectively offensive" as to "den[y] the student equal access to education.  (Dkt. # 30 at 3) accord Davis, 526 U.S. at 652. The updated policy is not overbroad.

### 2.    Content and Viewpoint Discrimination

In mirroring Davis, the University's discriminatory-harassment policy also fails to run afoul of the Constitution for being viewpoint based and not narrowly tailored.  "[R]estrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." Minn. Voters All. v. Manksy, 138 S.Ct. 1876, 1885 (2018).  "A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC, 142 S.Ct. 1464, 1471 (2022) (citing Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015)).

The discriminatory-harassment policy is not "agnostic as to content."  City of Austin, 142 S.Ct. 1471.  It specifically targets speech about a list of characteristics—race, color, national origin, age, sex, gender expression, among others.  (Dkt. # 4-6.)  It must therefore satisfy strict scrutiny, under which the University must show that its restriction is narrowly tailored to promote a compelling governmental interest; if there is a less restrictive alternative available, the policy cannot survive strict scrutiny.  See Reed, 576 U.S. at 171.

The University has a compelling interest in preventing discrimination, see Bd. of Directors of Rotary Intern. v. Rotary Club of Duarte, 481 U.S. 537, 549 (1987), and the policy is narrowly tailored, as it closely resembles the Davis standard. The prohibition on conduct is limited to that which would deny students equal access to education.  (Dkt. # 30 at 2–3). This is narrowly tailored. See e.g., Saxe v. State College Area Sch. Dist., 240 F.3d 200, 217 (3d Cir. 2001) (holding harassment policy unconstitutional under Tinker because prohibition was not limited to that which "pose[s] a realistic threat of substantial disruption.").

### B.    Likelihood of Success on the Merits – Computer Policy

 As a refresher, the updated computer policy prohibits "using Texas State's information resources to influence the election or nomination of a person for a state, local, or federal office or for similar partisan political activities."  (Dkt. # 30 at 4.)  "Information resources" include "any device that connects to or

communicates electronically via the institutional network," and also university-provided email accounts.  (Dkt. # 4-11 at 3.)  Speech First argues that the computer policy is an overbroad, content-based restriction on speech that does not survive strict scrutiny.  Speech First also argues that the policy is void for vagueness.[5]

1.    Impact of Tex. Gov't Code § 556.004(c)

As discussed above, Tex. Gov't Code § 556.004(c) does permit and require the University, as a state agency, to regulate the political conduct of its state officers and employees.  Speech First does not challenge the computer policy in so far as it applies to state officers or employees, including student employees.  The issue this Court addresses is the constitutionality of this policy as applied to non-employee students.  At the August 30, 2023, hearing, the Court raised the issue of students who are also employees of the University.  (Tr. 19:1 – 24.)  The parties agreed that such a student would be subject to the computer policy.  (Id.)  Speech First also stipulated that none of its member students are student employees.  (Id.)  Accordingly, the Court addresses in this order the rights of students, not student employees, state officers, or non-student state employees.

---

[5] The Court notes that the alterations in the computer policy language limit the prohibited activities to partisan political activities instead of barring all political activities. However, this change does not constitute significant transformation as to alter Speech First's objections to it.

2.    Public v. Nonpublic Forum

The parties disagree as to whether the University's information resources are a public or nonpublic forum.  "There are two broad categories of forums: (1) traditional and designated public forums and (2) limited public forums and nonpublic forums." Freedom From Religion Found. v. Abbott, 955 F.3d 417, 426 (5th Cir. 2020) (citing Chiu v. Plano Indep. Sch. Dist., 260 F.3d 330, 344-47 (5th Cir. 2001) (per curiam)).  "Traditional public forums are places such as sidewalks, streets, and parks that have traditionally been devoted to assembly or debate." Id. (citing Chiu, 260 F.3d at 344); see also Packingham v. North Carolina, 582 U.S. 98, 106-07 (2017) (explaining that the internet is today's "modern public square").  "Designated public forums are places that the government has designated for the same widespread use as traditional public forums." Freedom From Religion Found., 955 F.3d at 426 (citing Fairchild v. Liberty Indep. Sch. Dist., 597 F.3d 747, 758 (5th Cir. 2010)).  In traditional and designated public forums, "any restriction based on the content of the speech must satisfy strict scrutiny." Pleasant Grove City v. Summum, 555 U.S. 460, 469 (2009); accord United States v. Alvarez, 567 U.S. 709, 717 (2012).

"Limited public forums are places that the government has opened for public expression of particular kinds or by particular groups." Freedom From Religion Found., 955 F.3d at 426 (citing Chiu, 260 F.3d at 346).  "Nonpublic

forums are forums that are not open for public communication by tradition or designation." Id. (citing Chiu, 260 F.3d at 347).  "The government can restrict speech in a limited public forum or nonpublic forum as long as the restriction is (1) reasonable in light of the purpose served by the forum and (2) does not discriminate against speech on the basis of viewpoint."  Id. (citing Chiu, 260 F.3d at 346–47).  The Fifth Circuit has not decided which type of forum is created by a state university email system.  White Buffalo Ventures, LLC v. Univ. Tex. Austin, 420 F.3d 366, 374 (5th Cir. 2005).

The University contends that its information resources are not open to the general public, given that it "provides official university email addresses and services to its students, faculty, staff, retirees, and organizational units for [official university communications] and to enhance the efficiency of educational administrative processes," and provides authorized Texas State NetID to facilitate access to its information resources.  (Dkt. # 4-11 at 5.)  These limitations are comparable to those in the context of school mail delivery systems, which both the Fifth Circuit and Supreme Court have found to be nonpublic forums, even if open to certain non-school uses.  See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 47 (1983) (finding internal mail system a nonpublic forum because there was "no indication in the record that the school mailboxes and interschool delivery system are open for use by the general public."); Chiu, 260 F.3d at 350

(finding school mail delivery system a nonpublic forum where there was "no evidence that the PISD's selective opening of the school mail system was intended to create a designated public forum for use by the general public").

       i.      <u>If University Information Resources are a Nonpublic<br>Forum, the Computer Policy is Unconstitutional</u>

If the University's information resources are considered a nonpublic forum, the computer policy does not pass Constitutional muster. The University has failed to demonstrate that prohibiting the use of information resources "to influence the election or nomination of a person for a state, local, or federal office or for similar partisan political activities"[6] is a "reasonable restriction in light of the purpose served by the forum." (Dkt. # 30 at 4.); <u>Freedom From Religion Found.</u>, 955 F.3d at 426. The stated purpose of the information resources system is "accomplishing tasks related to the university's mission" including "satisfying institutional business, research, or instructional needs." (Dkt. # 4-11 at 4.) Even if the University had an interest—consistent with the Texas Code it cites—in preventing its employees from using University email addresses to improperly "interfere with or affect the result of an election," the University is silent as to why

---

[6] This section prohibits a state officer or employee from, among other things, using official authority or influence "to interfere with or affect the result of an election or nomination of a candidate or to achieve any other political purpose." Tex. Gov't Code § 556.004(c).

this logic should apply to student communications, let alone why this use is inconsistent with "accomplishing tasks related to the university's mission." <u>See</u> Tex. Gov't Code § 556.004(c).

> ii. <u>If University Information Resources are a Public Forum, the Computer Policy is Unconstitutional</u>

If the University's information resources are considered a public forum, the computer policy falls even shorter of constitutionality. The computer policy is content based; the University lets users send speech about a wide variety of topics *except for* "partisan political activities." (Dkt. # 30 at 4.) This is prototypical content-based regulation. <u>See</u> <u>Reed</u>, 576 U.S. at 169 (explaining that "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed"). As a content-based regulation, the University must show that the computer policy is narrowly tailored to promote a compelling governmental interest.[7]  <u>See</u> <u>id.</u> at 171. The University has failed to

---

[7] The parties submitted, at the request of the Court, additional information regarding the frequency of similar computer policies across Texas universities. (Dkt. # 31; Dkt. # 32.) The Court conducted its own research on this point, attached as Exhibit A. Of the 39 public universities investigated, only 8, 20.5%, have policies similarly broad as the University's computer policy. (Ex. A.)  Thirty-one universities, 79.5%, either have no computer policy that applies to non-employee students or has a policy that is narrower than the University's policy. (<u>Id</u>.)  The Court notes the narrower policies would likely be sufficiently narrowly tailored to be constitutional if University Information Resources are a Public Forum.  <u>See</u> <u>Reed</u>, 576 U.S. at 171.

identify a compelling governmental interest in suppressing partisan political speech.[8]  The Supreme Court has repeatedly held that "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office."  <u>Arizona Free Enter. Club's Freedom Club PAC v. Bennett</u>, 564 U.S. 721, 734 (2011) (cleaned up).  Indeed, the Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance."  <u>Fed. Election Comm'n v. Cruz</u>, 142 S.Ct. 1638, 1652 (2022).  No such interest is involved in preventing students from discussing political candidates or campaigns via university email or on university Wi-Fi.  Moreover, the University's computer policy has not been tailored, as in, for instance, limiting particularly disruptive, incendiary, or otherwise unprotected speech.  Accordingly, the computer policy fails as a regulation of speech within the University's information resources, whether considered a public or nonpublic forum.

      3.    <u>Vagueness</u>

Finally, the Court does not agree with Speech First that the updated computer policy is void for vagueness, nor does it need to, as the Court has found

---

[8] That is, speech coming from students. The Court recognizes the policy is in accord with Tex. Gov't Code § 556.004(c) regarding speech from state officers or employees.

the policy constitutionally void on other grounds above.  A law is

unconstitutionally vague when it "either forbids or requires the doing of an act in

terms so vague that men of common intelligence must necessarily guess at its

meaning and differ as to its application." Cramp v. Bd. of Pub. Instruction of

Orange Cty., Fla., 368 U.S. 278, 287 (1961).  "In evaluating vagueness, a

reviewing court should consider: (1) whether the law gives the person of ordinary

intelligence a reasonable opportunity to know what is prohibited, so that he may

act accordingly, and (2) whether the law provides explicit standards for those

applying them to avoid arbitrary and discriminatory applications." Roark &

Hardee LP v. City of Austin, 522 F.3d 533, 551 (5th Cir. 2008) (cleaned up)

(quoting Grayned v. City of Rockford, 408 U.S. 104, 108–09, (1972)).  The

computer policy prohibits "using Texas State's information resources to influence

the election or nomination of a person for a state, local, or federal office *or for*

*similar partisan political activities*." (Dkt. # 30 at 4.)  The statutory and

constitutional construction principle of "ejusdem generis" provides clarity to

"similar partisan political activities."  While this phrase may be vague on its own,

it follows examples of election or nomination of a person to state, local, or federal

office.  "Similar partisan political activities," is therefore construed as limited and

will apply only to things of the same kind as election or nomination to office. See

*Ejusdem Generis*, Legal Information Institute, CORNELL LAW SCHOOL (Feb. 2022)

https://www.law.cornell.edu/wex/ejusdem_generis.  For instance, the Court noted during the August 30, 2023, hearing that a student email advertising the presence of a political candidate on campus for a speech would not fall into the category of "similar partisan political activity." (Tr. 15:1–12.)  However, an email urging students to vote for a candidate in an upcoming election would be a partisan political activity. (Id.)  The nature of the phrase is not sufficiently vague for the policy to be unconstitutional on this ground.

C.    Irreparable Harm & Balance of Harms and Public Interest

For the purposes of determining whether to grant injunctive relief, injury is "irreparable" if the injured party "cannot be adequately compensated in damages or if damages cannot be measured by any certain pecuniary standard." Broyles v. Texas, 618 F.Supp.2d 661, 681 (S.D. Tex. 2009).  The injury must be "permanent or of long duration," and must be a harm that "cannot be redressed by either an equitable or legal remedy following trial."  W. Ala. Quality of Life Coal. V. U.S. Fed. Highway Admin., 302 F.Supp.2d 672, 683-84 (S.D. Tex. 2004). Irreparable harm is "neither speculative nor remote, but is actual and imminent." Id. at 684.

The University's only contention on the remaining preliminary injunction factor is that the student-members have other ways to engage in the political speech prohibited by the computer policy.  (Dkt. # 22 at 20-21.)  This

27

argument is not convincing, as it misses the point: "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S.Ct. 63, 67 (2020) (per curiam) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion)); cf. Perry, 460 U.S. at 45 (holding that a reasonable regulation of First Amendment activity within a public forum "must leave open ample alternative channels of communication.").[9]  As to the balance of harms and public interest, the only harm[10] here "is the inability to . . . violat[e] the First Amendment, which is really no harm at all." McDonald v. Longley, 4 F.4th 229, 255 (5th Cir. 2021) (cleaned up). Finally, "injunctions protecting First Amendment freedoms are always in the public interest." Texans for Free Enter. v. Tex. Ethics Comm'n, 732 F.3d 535, 539 (5th Cir. 2013) (quotation marks omitted).

## CONCLUSION

Speech First has standing to pursue its claims. However, Speech First has demonstrated all factors required for a preliminary injunction only as to the

---

[9] Whether there are alternative channels of communication open for the prohibited speech goes to a time, place, and manner inquiry, but the University fails on the merits of its argument even in that context.  Because the computer policy regulates not only university emails, but university networks, students couldn't simply "us[e] their own personal emails" to send political messages, as the University suggests, as such use would likely be on university networks, nonetheless.  (Dkt. # 22 at 21.)

computer policy.  As a result, Speech First is entitled to a preliminary injunction of only the computer policy, and only as it pertains to students, not state officers or employees, including student employees.  Moore v. Brown, 868 F.3d 398, 402–03 (5th Cir. 2017) (per curiam); FED. R. CIV. P. 65.  Accordingly, the Court **DENIES** Plaintiff's Motion for Preliminary Injunction as to the discriminatory-harrassment policy and **GRANTS** Plaintiff's Motion for Preliminary Injunction to the computer policy only as it applies to students who are not employees of the University.  (Dkt. # 4.)

      **IT IS SO ORDERED.**

      **DATED:** Austin, Texas, September 1, 2023.


_____

David Alan Ezra
Senior United States District Judge

29

# EXHIBIT A

Computer Policies of Public Texas Universities

| | Raw Number | Percentage |
|---|---|---|
| **Total Universities Investigated** | 39 | |
| No Student Policy | 14 | 35.9% |
| Narrower Student Policy than Texas State<br><br>*predominately "political lobbying or campaigning"*[1] | 17 | 43.6% |
| Similarly Broad Student Policy as Texas State<br><br>*including Texas State ("the University")* | 8 | 20.5% |
| Student Policy, *both* narrower and similarly broad | 25 | 64.1% |
| No Student Policy *or* *narrower* Student Policies | 31 | 79.5% |

---

[1] The Court notes the narrower policies that limit the prohibition on using student email to "political lobbying and campaigning" are likely sufficiently narrowly tailored to constitutionally achieve a compelling government interest.  Of course, these universities would still have to explain what compelling government interest their policies achieve – being narrowly tailored alone is not enough.  Here, the University has failed to allege a compelling government interest or demonstrate its policy is sufficiently narrowly tailored to achieve such an interest.

Computer Policies of Public Texas Universities



Percentage

- No Student Policy
- Narrower
- Similarly Broad

Percentage

- No Student Policy
- Student Policy (Narrower to or Similarly Broad as the University's Policy)



Percentage

- Similarly Broad Policy as the University's Computer Policy (including the University's policy)
- No Student Policy or a Narrower Student Policy

Computer Policies of Public Texas Universities

| University | Applies to Non-Employee Students? | If yes, what does the policy prohibit? |
|---|---|---|
| Texas A&M University | No | |
| University of Houston | No | |
| University of North Texas | No | |
| Lamar University | No | Cites Texas Government Code §556.004 – Prohibits using state resources or programs to influence elections or to achieve any other political purpose.<br><br>Texas Government Code §556.004 only prohibits employees and state officers. |
| University of Houston–Downtown | No | |
| Stephen F. Austin State University | No | |
| West Texas A&M University | No | |
| Texas A&M University–San Antonio | No | |

3

Computer Policies of Public Texas Universities

| | | |
|---|---|---|
| University of Houston–Victoria | No | |
| Texas A&M University–Central Texas | No | |
| Texas A&M University–Texarkana | No | |
| Texas A&M University at Galveston | No | Students may not promote or endorse political campaigns or candidates on the A&M social media pages. They may do so on their private pages, and there are no restrictions on use of university email. |
| Sul Ross State University | No | |
| Lamar State College Orange | No | Cites Texas Government Code §556.004 – Prohibits using state resources or programs to influence elections or to achieve any other political purpose.  Texas Government Code §556.004 only prohibits employees and state officers. |
| University of Texas at Austin | Yes | Political lobbying or campaigning |
| University of Texas at Arlington | Yes | Political lobbying or campaigning |

Computer Policies of Public Texas Universities

| | | |
|---|---|---|
| University of Texas Permian Basin | Yes | Political lobbying or campaigning |
| University of Texas at San Antonio | Yes | Political lobbying or campaigning |
| University of Texas Rio Grande Valley | Yes | Political lobbying or campaigning |
| University of Texas at Dallas | Yes | Political lobbying or campaigning |
| University of Texas at El Paso | Yes | Political lobbying or campaigning |
| Sam Houston State University | Yes | Political lobbying or campaigning |
| Texas Woman's University | Yes | Political lobbying or campaigning |
| Tarleton State University | Yes | Political lobbying or campaigning |
| Texas A&M University–Commerce | Yes | Political lobbying or campaigning |
| Texas A&M University–Corpus Christi | Yes | Prohibits using email to conduct organized political activity that is inconsistent with the university's tax-exempt status. |

Computer Policies of Public Texas Universities

| | | |
|---|---|---|
| Midwestern State University | Yes | Political lobbying or campaigning |
| University of Texas at Tyler | Yes | Political lobbying or campaigning |
| University of North Texas at Dallas | Yes | Political lobbying or campaigning |
| University of Houston–Clear Lake | Yes | Related to any form of political lobbying |
| Texas A&M International University | Yes | Email for purposes of political lobbying or campaigning. |
| Texas State University | Yes | *AT ISSUE HERE:*<br><br>Prohibits "using Texas State's information resources to influence the election or nomination of a person for a state, local, or federal office or for similar partisan political activities."<br><br>(Dkt. # 30 at 4.) |
| Texas A&M University–Kingsville | Yes | For personal or political benefit |
| Lamar State College Port Arthur | Yes | To affect the result of a local, state, or national election or to achieve any other political purpose (consistent with Texas Government Code §556.004).*<br><br>*This is the original policy that Texas State had. But for the policy to be consistent with Texas* |

Computer Policies of Public Texas Universities

|  |  |  |
|---|---|---|
|  |  | *Government Code §556.004, it would apply ONLY to student employees.* |
| Lamar Institution of Technology | Yes | To affect the result of a local, state, or national election or to achieve any other political purpose* <br><br> *very similar to the original policy Texas State had, without the reference to the Texas Government Code §556.004 that effectively limits the policy's application to student employees* |
| Texas Tech University | Yes | Political purposes |
| Angelo State University | Yes | Unauthorized political purposes |
| Prairie View A&M University | Yes | Messages of a religious, political, or racial nature |
| Texas Southern University | Yes | Using the University's computer system for the transmission of commercial or personal advertisements, solicitations, promotions, or political material except as may be approved by the President and/or Board of Regents. |